**SAMUELS, KRAMER & COMPANY,**
Petitioner–Appellant,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

**Nos. 274, 275, Dockets 90–4060, 90–4064.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 24, 1990.

Decided April 2, 1991.

Kathleen M. Sullivan, Cambridge, Mass. (Brian Stuart Koukoutchos, Cambridge, Mass., and Richard J. Sideman, Martha A. Boersch, Sideman & Bancroft, San Francisco, Cal., of counsel), for petitioner-appellant Samuels, Kramer & Co.

Kenneth W. Starr, Sol. Gen., Dept. of Justice, Washington, D.C. (Shirley D. Peterson, Asst. Atty. Gen., John G. Roberts, Jr., Deputy Sol. Gen., Stephen J. Marzen, Asst. to the Sol. Gen., Gary R. Allen, and Steven W. Parks, Dept. of Justice, Washington, D.C., of counsel), for respondent-appellee C.I.R.

Erwin N. Griswold, Washington, D.C. (Michael Doss, Jones, Day, Reavis & Pogue, Washington, D.C., of counsel), for amicus curiae Erwin N. Griswold.

Before MESKILL and ALTIMARI, Circuit Judges, and METZNER *, District Judge.

MESKILL, Circuit Judge:

Samuels, Kramer & Company (the Company) challenges the authority of the Chief Judge of the United States Tax Court to appoint "special trial judges" and to assign the adjudication of tax cases involving complex issues and substantial deficiency assessments to these "special judges" pursuant to 26 U.S.C. §§ 7443A(a) and 7443A(b)(4). The Company submits that section 7443A does not authorize the assignment of such cases to "special trial judges," and if authorized, the Chief Judge's appointment of such judges violates the Appointments Clause of the Unit-

---

* Honorable Charles M. Metzner, United States District Judge for the Southern District of New York, sitting by designation.

ed States Constitution, Article II, Section 2, Clause 2.

## BACKGROUND

The Company is a Nevada corporation with its principal place of business in New York City. The Company invested, for itself and for others, in straddles in forward contracts to buy and to sell government securities. Specifically, the Company would agree to buy (a long position) or to sell (a short position) at a pre-set price certain securities on a specific date in the future. As a straddle investor, the Company would hold an equal number of long and short positions in the same underlying security. This investment strategy permitted favorable tax treatment of both gains and losses.

In July 1984, after auditing the Company's tax returns for the years 1979, 1980, and 1981, the Commissioner of the Internal Revenue Service (Commissioner) notified the Company of a tax deficiency in an aggregate amount of approximately $1.4 million. The Commissioner also imposed pursuant to 26 U.S.C. § 6653(b) a civil fraud penalty of $568,291 in connection with the Company's return for the 1979 tax year and assessed interest at the penalty rate of 120 percent of the ordinary underpayment rate pursuant to 26 U.S.C. § 6621(c)(1). In March 1986, after auditing the Company's return for the tax year ending October 31, 1982, the Commissioner notified the Company of a deficiency in the amount of $20,300 and assessed additional penalties. In both instances, the Commissioner asserted that the Company's straddle investments were sham transactions which lacked economic substance and which had not been entered into for profit. Indeed, with respect to the pre–1982 tax years, the IRS took the position that these transactions were "entered into solely or primarily to reduce income taxes by converting short term capital gain and ordinary income to long term capital gain income and defer reporting the same." The Commissioner asserted several other argu-

ments to support the deficiency assessment.

In response to these notifications and assessments, the Company availed itself of its right to contest the deficiencies in the United States Tax Court. The Company filed two petitions with the Tax Court seeking redetermination of the deficiencies. The Chief Judge of the United States Tax Court, Arthur L. Nims, III, acting pursuant to 26 U.S.C. § 7443A and Tax Court Rules of Practice and Procedure 180, 181, and 183, assigned each of the Company's petitions to special trial judge Carleton D. Powell "for trial or other disposition."

The Company and other Tax Court petitioners, who also had their cases assigned to a special trial judge, moved to vacate the assignment of their cases on the grounds that the assignment was not authorized by section 7443A, and, if authorized by section 7443A, violated the Appointments Clause of the Constitution, Article II, Section 2, Clause 2. The Tax Court consolidated the cases for purposes of ruling on the motions to vacate the assignments.

On April 9, 1990, in an opinion reviewed by the full Tax Court pursuant to 26 U.S.C. § 7460(b), the Tax Court denied the motions to vacate the assignments (two judges did not participate). *First Western Gov't Sec., Inc. v. Commissioner*, 94 T.C. 549 (1990). The Tax Court concluded (1) that the language, structure, and legislative history of section 7443A clearly demonstrates Congress' intent to assign "any other proceeding" to a special trial judge for hearing and report, and (2) that the Tax Court is a "Court of Law" within the meaning of the Appointments Clause and that special trial judges are "inferior officers" within the meaning of that Clause. Thus, the Tax Court held that the appointment of a special trial judge by the Chief Judge of the Tax Court comported with the Appointments Clause.[1] In an order accompanying its opinion, the Tax Court certified the issues advanced by the Company and the other petitioners for interlocutory appeal pursuant to 26 U.S.C. § 7482(a)(2). The

---

1. Appearing as *amicus curiae*, Erwin N. Griswold, former Solicitor General, submits that the

Tax Court's decision should be affirmed in all respects.

Tax Court also stayed all the proceedings pending resolution of any interlocutory appeal. On April 18, 1990, the Company filed a motion in this Court for leave to appeal and on May 16, 1990, we granted the motion.

## DISCUSSION

The United States Tax Court was created by Congress to provide taxpayers with a means of challenging assessments made by the Commissioner without first having to pay the alleged deficiency. Without such a forum, taxpayers would have to pay the asserted deficiency and then initiate a suit in federal district court for a refund. The Tax Court is currently composed of nineteen judges who are appointed by the President with the advice and consent of the Senate. The judges serve fifteen year terms and are paid at the same rate and in the same installments as federal district court judges. 26 U.S.C. § 7443.

The Company does not challenge the legitimacy of the Tax Court. Rather, the Company questions the constitutional authority of the Chief Judge of the Tax Court to appoint "special trial judges" and his statutory authority to assign large tax cases to these judges for adjudication. We, therefore, must address two basic issues: (1) whether 26 U.S.C. § 7443A permits the assignment of a tax case that involves complex issues and a large deficiency assessment to a "special trial judge" for adjudication, and (2) if permitted, whether the Appointments Clause of the Constitution permits the Congress to vest the Chief Judge with the power to appoint a "special trial judge."

### A. *Scope of Review*

The Courts of Appeals have jurisdiction to review the decisions of the Tax Court. 26 U.S.C. § 7482(a)(1). In general, Tax Court decisions are to be reviewed "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." 26 U.S.C. § 7482(a). An appeal of an interlocutory order, however, is permissive and is not a matter of right. *Id.* at § 7482(a)(2)(A). Here, we granted the application of the Company to review the Tax Court's interlocutory order addressing the authority of the Chief Judge to appoint special trial judges and to assign complex cases to these judges. The questions before us present pure issues of law. As such, we review the Tax Court's determinations *de novo. Vukasovich, Inc. v. Commissioner,* 790 F.2d 1409, 1413 (9th Cir.1986).

### B. *Authority Under Section 7443A*

In challenging the power of the Chief Judge of the Tax Court to assign cases to a "special trial judge," the Company asserts that the language and structure of section 7443A clearly demonstrate that Congress did not intend complex tax cases involving substantial deficiencies to be assigned to special trial judges. We, therefore, must interpret the language of this provision.

"It is axiomatic that '[t]he starting point in every case involving construction of a statute is the language itself.'" *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 685, 105 S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985) (quoting *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, *J.,* concurring)). The plain meaning of the statute's language should control except in the "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982). In such cases it is the intention of the legislators, rather than the strict language, that controls. *Id.* Finally, "in expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 51, 107 S.Ct. 1549, 1555, 95 L.Ed.2d 39 (1987) (citations omitted). With these guiding principles in mind, we turn to the statute and its language.

Section 7443A confers on the Chief Judge of the Tax Court the authority to appoint a special trial judge and to assign certain tax cases to such judges for adjudi-

cation. Section 7443A provides, in pertinent part:

(a) *Appointment*

The chief judge may, from time to time, appoint special trial judges who shall proceed under such rules and regulations as may be promulgated by the Tax Court.

(b) *Proceedings which may be assigned to special trial judges*

The chief judge may assign—

(1) any declaratory judgment proceeding,

(2) any proceeding under section 7463,

(3) any proceeding where neither the amount of the deficiency placed in dispute (within the meaning of section 7463) nor the amount of any claimed overpayment exceeds $10,000, and

(4) *any other proceeding which the chief judge may designate* (emphasis added),

to be heard by the special trial judges of the court.

(c) *Authority to make court decision*

The court may authorize a special trial judge to make the decision of the court with respect to any proceeding described in paragraph (1), (2), or (3) of subsection (b), subject to such conditions and review as the court may provide.

26 U.S.C. § 7443A.

█ The central question we must address is whether the phrase "any other proceeding," which is found in subsection (b)(4), permits the assignment of any tax case to a special trial judge, or if subsection (b)(4) assignments are limited to small and non-complex cases. The Company concedes that the phrase "any other proceeding" when read in isolation could be construed to permit the assignment of cases similar to those that provided the basis for this appeal. The Company, however, relying on the rule of *ejusdem generis*,[2] argues that given the entire structure of section 7443A the phrase "any other proceeding" should not be read so broadly. It is the

Company's view that the phrase "any other proceeding" only encompasses proceedings of a similar nature to those enumerated in section 7443A(b)(1)–(3), *i.e.*, matters that involve a small amount, matters that do not involve complex issues, and matters in which the scope of trial is limited. Any other interpretation, reasons the Company, would render the limitations imposed by section 7443A(b)(1)–(3) a nullity. In support of this argument, the Company relies on the Supreme Court's decision in *Gomez v. United States*, 490 U.S. 858, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989).

In *Gomez*, the Supreme Court construed the provisions of the Federal Magistrates Act, 28 U.S.C. § 631 *et seq.* In particular, one section of the Magistrates Act permitted federal magistrates to "be assigned such additional duties as are not inconsistent with the Constitution and laws of the United States." 28 U.S.C. § 636(b)(3). This general grant of authority followed a list of specifically enumerated duties which a district judge could delegate to a magistrate. The question before the Court was whether this general provision permitted the assignment to a magistrate of juror *voir dire* in a criminal case. In holding that the Magistrates Act did not permit a district court to assign *voir dire*, the Court stated:

When a statute creates an office to which it assigns specific duties, those duties outline the attributes of the office. Any additional duties performed pursuant to a general authorization in the statute reasonably should bear some relation to the specified duties.

*Gomez*, 490 U.S. at 864, 109 S.Ct. at 2241. The Court concluded that Congress did not intend magistrates to preside over important stages of a felony trial. Jury *voir dire* was found to be one of these important stages. The Court rested its decision on two grounds: (1) the statute expressly specified those functions that magistrates were authorized to conduct, and (2) the

---

**2.** This is a rule of statutory construction that provides that when general words follow the enumeration of particular classes, the general words should be construed as applying only to things of the same general class as those enumerated. Black's Law Dictionary 517 (6th ed. 1990).

legislative history was replete with statements that magistrates were only to handle "subsidiary matters" thereby demonstrating Congress' intent to limit the responsibilities of the magistrates. *Id.* at 872, 109 S.Ct. at 2245.

The Company's reliance on *Gomez* is misplaced. Here, unlike the situation in *Gomez*, the statute itself draws a distinction between the categories of cases enumerated in subsections (b)(1)–(3) and the category of "any other proceeding" found in subsection (b)(4). The first three categories are (1) declaratory judgment proceedings, (2) small cases involving less that $10,000 conducted under section 7463, and (3) other cases involving less than $10,000. Where a special trial judge is assigned a case pursuant to subsections (b)(1)–(3), the Tax Court *may* authorize the special trial judge to render a final decision. 26 U.S.C. § 7443A(c). Special trial judges, however, *cannot* render the final decision of the Tax Court in cases assigned under the fourth category—"any other proceeding."[3] *See id.*

This statutory distinction demonstrates that Congress intended to differentiate subsection (b)(4) cases, in which the ultimate decisional authority remains with the Tax Court, from those cases in which a special trial judge may make the final decision. Congress' decision to vest final decisional authority exclusively in the Tax Court in subsection (b)(4) cases is a clear indication of its intention to permit the assignment of complex cases to special trial judges. We, therefore, decline to adopt the Company's proposed construction because

to do so would render superfluous the distinction drawn by the plain language of subsection (c).

The legislative history of section 7443A lends little, if any, support to the Company's argument. Under 26 U.S.C. § 7456 (1982), the predecessor to section 7443A, special trial judges were referred to as "commissioners."[4] Tax Reform Act of 1984, P.L. No. 98–369, §§ 463, 464, 1984 U.S.Code Cong. & Admin.News (98 Stat.) 824–25. The commissioners were only authorized to hear minor tax cases and declaratory judgment disputes. *See* 26 U.S.C. § 7456 (1982) (current version at 26 U.S.C. § 7443A). These small cases could not be appealed and they had no precedential value. *Id.* In 1984 Congress made several amendments to section 7456. Specifically, the term "special trial judge" was adopted to replace the term "commissioner," subsection (d)(3) was changed to raise the maximum amount in dispute provision from $5,000 to $10,000, and subsection (d)(4) providing for the assignment of "any other proceeding" was added. Tax Reform Act of 1984, §§ 463, 464. At the same time, the Chief Judge was given authority to permit special trial judges to render final decisions in cases arising under subsections (d)(1)–(3). *Id.* The statutory provisions addressing the role of special trial judges were ultimately consolidated and recodified in section 7443A. Tax Reform Act of 1986, P.L. No. 99–514, § 1556, 1986 U.S.Code Cong. & Admin.News (99 Stat.) 2754–55 (recodifying section 7456(d)(1)–(4) at section 7443A(b)(1)–(4) & (c)).

> The Division to which the case is assigned may adopt the Special Trial Judge's report or may modify it or reject it in whole or in part, or may direct the filing of additional briefs or may receive further evidence or may direct oral argument, or may recommit the report with instructions. Due regard shall be given to the circumstance that the Special Trial Judge had the opportunity to evaluate the credibility of witnesses, and the findings of fact recommended by the Special Trial Judge shall be presumed to be correct.

**3.** To implement this statutory provision, the Tax Court, pursuant to the authority conferred by 26 U.S.C. § 7453, promulgated Rule 183 of the Tax Court Rules of Practice and Procedure. Rule 183 further defines the respective functions of the special trial judges and the Tax Court in cases where the amount in dispute exceeds $10,-000. After conducting the trial and after the submission of any briefs, the special trial judge must submit a report, including his findings of fact and conclusions of law, to the chief judge, who in turn assigns the case to a Division of the Tax Court. Rule 183(b). Rule 183(c) addresses the duties and authority of the Tax Court Division:

**4.** The provisions that parallel those currently found in section 7443A(b)(1)–(3) were previously codified at section 7456(d)(1)–(3).

The Company submits that Congress, in adopting these amendments, did not intend to grant special trial judges the authority to hear complex cases. The Company places great emphasis on the limited legislative history that accompanied the amendments. In explaining the basis for adopting the present section 7443A(b)(4), the Report of the Committee on Ways and Means stated:

### Reasons for Change

The committee wishes to clarify that additional proceedings may be assigned to Commissioners [Special Trial Judges] so long as a Tax Court judge must enter the decision.

### Explanation of Provision

A technical change is made to allow the Chief Judge of the Tax Court to assign any proceeding to a special trial judge for hearing and to write proposed opinions, subject to review and final decision by a Tax Court judge, regardless of the amount in issue. However, special trial judges will not be authorized to enter decisions in this latter category of cases.

H.R.Rep. No. 432, 98th Cong., 2nd Sess. 1568, *reprinted in* 1984 U.S.Code Cong. & Admin.News 697, 1198. The Company focuses on the phrase "a technical change" and argues that its use indicates that Congress did not intend to expand substantively the authority of special trial judges. We disagree.

When read in its entirety, the legislative history shows that Congress knowingly expanded the authority of special trial judges and appreciated the significance of that action. In particular, Congress not only removed the "maximum amount in dispute" jurisdictional requirement, but also precluded special trial judges from entering the final decision in any cases assigned pursuant to this provision. That responsibility was reserved exclusively for judges of the Tax Court. As the Conference Report emphasized: "The House Bill also provides that other proceedings may be assigned to be heard by [special trial judges],

but no decision with respect to these proceedings may be made by a [special trial judge]." H.R.Conf.Rep. No. 861, 98th Cong., 2nd Sess. 1127, *reprinted in* 1984 U.S.Code Cong. & Admin.News 1445, 1815.

■ Given the plain language of section 7443A and its legislative history, we conclude that Congress in using the phrase "any other proceeding" intended to authorize the Chief Judge of the Tax Court to assign any tax case, regardless of complexity or amount in controversy to a special trial judge for adjudication. We reach this conclusion ever mindful of the settled rule of construction that requires " '[f]ederal statutes ... to be so construed as to avoid serious doubt of their constitutionality.' " *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 841, 106 S.Ct. 3245, 3251, 92 L.Ed.2d 675 (1986) (quoting *Machinists v. Street*, 367 U.S. 740, 749, 81 S.Ct. 1784, 1790, 6 L.Ed.2d 1141 (1961)). We recognize that our construction of section 7443A raises serious questions under the Appointments Clause of Article II of the Constitution. When confronted with such a situation, however, the Supreme Court has counselled:

> [T]his canon of construction does not give a court the prerogative to ignore the legislative will in order to avoid constitutional adjudication; " '—[a]lthough this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute ...' or judicially rewriting it."

*Id.* (quoting *Aptheker v. Secretary of State*, 378 U.S. 500, 515, 84 S.Ct. 1659, 1668, 12 L.Ed.2d 992 (1964) (quoting *Scales v. United States*, 367 U.S. 203, 211, 81 S.Ct. 1469, 1477, 6 L.Ed.2d 782 (1961))). Unable, in this instance, to avoid the plain import of the statute's language and of Congress' intent, we now direct our attention to the Company's constitutional challenge.

### C. The Appointments Clause

The Company submits that if section 7443A is found to permit the assignment of

complex cases involving large amounts in controversy to a special trial judge, then the statute violates the Appointments Clause of the Constitution, Article II, Section 2, Clause 2. It argues that a special trial judge is an "officer" of the United States who must be appointed in compliance with the Appointments Clause. The Appointments Clause provides in pertinent part: .

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

Thus, the Constitution divides into two classes all the nation's officers that are deemed subject to appointment. *United States v. Germaine*, 99 U.S. 508, 509, 25 L.Ed. 482 (1879). "Principal officers are selected by the President with the advice and consent of the Senate. Inferior officers Congress may allow to be appointed by the President alone, by the heads of departments, or by the Judiciary." *Buckley v. Valeo*, 424 U.S. 1, 132, 96 S.Ct. 612, 688, 46 L.Ed.2d 659 (1976) (per curiam). Assuming that a special trial judge is an "officer," the Company contends that the Chief Judge of the Tax Court does not fall within any of the Constitution's three repositories of the appointment power.

### 1. *Waiver*

■ At the outset, we address the Commissioner's argument that the Company has waived its right to challenge the constitutional propriety of section 7443A. The Commissioner contends that the Company waived its right to challenge the constitutionality of section 7443A when it chose to litigate its tax deficiencies in the Tax Court, rather than to pay the tax assessed and then seek a refund in federal district court. We disagree.

Although it is true that the Company affirmatively elected to proceed in the Tax Court, this choice of forum in itself cannot be equated with a waiver of constitutional safeguards. The Commissioner cites *Freytag v. Commissioner*, 904 F.2d 1011, 1015 n. 9 (5th Cir.1990), *cert. granted,* —— U.S. ——, 111 S.Ct. 781, 112 L.Ed.2d 844 (1991), to support the proposition that taxpayers who voluntarily submit to having their claims adjudicated in the Tax Court waive certain constitutional protections.[5] In *Freytag*, the taxpayer first raised the Appointments Clause challenge to section 7443A on appeal and no objection was made at the time of the initial assignment of the case. This fact in itself serves to distinguish *Freytag* from the instant case wherein the Company challenged the assignment of its cases to a special trial judge from the outset. However, the Commissioner, relying on *Freytag*, argues that since Congress need not provide citizens with a forum in which to adjudicate their tax disputes prior to actual payment of an assessment, taxpayers cannot challenge the structure of the forum that Congress chose to create.

■ It is well settled that Congress has the discretion whether, and to what extent, to waive the government's sovereign immunity. *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). Starting from this premise, the Commissioner reasons that when Congress chooses to waive this immunity it can impose whatever conditions it sees fit. We find this analysis to be unduly superficial and fatally flawed. Nothing in the language of section 7443A suggests that Congress intended to limit a citizen's right to challenge the constitutional authority of a statutorily designated decisionmaker. Although Congress can prescribe conditions when it chooses to provide a waiver of sovereign immunity, *Cheatham v. Unit-*

---

**5.** We note that the *Freytag* Court addressed the waiver issue in a footnote, but did not examine any of the applicable law. 904 F.2d at 1015 n. 9.

*ed States,* 92 U.S. 85, 88–89, 23 L.Ed. 561 (1876); *Ex Parte Bakelite Corp.,* 279 U.S. 438, 453–54, 49 S.Ct. 411, 414, 73 L.Ed. 789 (1929) (Congress can condition resort to Claims Court on waiver of right to jury trial); *see also* 28 U.S.C. §§ 2674, 2402 (no right to jury trial in federal tort claims actions against the United States), we find no indication that Congress intended to do so in this instance. Here, Congress did not condition resort to the Tax Court on a citizen's waiver of the right to challenge the constitutional authority of the Tax Court's Chief Judge to appoint.[6]

Given that citizens are always free to consent to have their disputes adjudicated by private arbitrators and to waive their personal constitutional rights, the Commissioner also argues that taxpayers can consent to have their disputes resolved by the special trial judges. While the general principles relied on by the Commissioner are well established, *see, e.g., Boykin v. Alabama,* 395 U.S. 238, 242–43, 89 S.Ct. 1709, 1711–12, 23 L.Ed.2d 274 (1969) (waiver of right to jury trial by entering guilty plea); *Duncan v. Louisiana,* 391 U.S. 145, 158, 88 S.Ct. 1444, 1452, 20 L.Ed.2d 491 (1968) (criminal defendant can waive jury trial); *Heckers v. Fowler,* 69 U.S. (2 Wall.) 123, 128–29, 17 L.Ed. 759 (1865) (appointment of arbitrator with consent of both parties is permissible); Fed.R.Civ.P. 38(d) (waiver of jury trial in civil cases), we find the situation before us to be of a fundamentally different character. A challenge to the constitutional legitimacy of a governmental decisionmaker is more akin to a challenge based on subject matter jurisdiction. An official's power to act is being directly attacked.

Although it is true that citizens are free to resort to private forums to resolve disputes and to waive personal constitutional rights, where Congress has seen fit to create a public forum, the characteristics of that forum must be consistent with the structural imperatives imposed by the Constitution. Structural protections such as those embodied in the Appointments Clause stand on a different footing from personal constitutional rights. As the Supreme Court has stated, "[t]o the extent that [a] structural principle is implicated in a given case, the parties cannot by consent cure the constitutional difficulty." *Schor,* 478 U.S. at 850–51, 106 S.Ct. at 3256 (discussing importance of preserving an independent judiciary under Article III). The *Schor* Court's further comments are particularly applicable here: "[N]otions of consent and waiver cannot be dispositive because the [Constitution's] limitations serve institutional interests that the parties cannot be expected to protect." *Id.* at 851, 106 S.Ct. at 3257. If an official from the outset lacks the constitutional status that is a prerequisite to holding and to executing the duties of a particular office, we fail to see how a citizen can be deemed to consent to the decisionmaking authority of this official through silence or mere submission to the jurisdiction of the forum of which that official appears to be a member. In order to exercise the powers of an office, the particular official, assuming he or she qualifies as an "officer" of the United States, must be appointed in accordance with the terms of the Appointments Clause. *Buckley,* 424 U.S. at 135, 138–39, 96 S.Ct. at 689, 691–92. Were such institutional interests—as distinguished from personal constitutional rights—so easily waived, the affirmative requirements imposed by the Appointments Clause would effectively be rendered null and void.

### 2. *Special Trial Judge: Inferior or Principal Officer*

The Company's Appointments Clause challenge is premised on the assumption that a special trial judge is either a principal or inferior officer of the United States. If we conclude that neither characterization is applicable and that a special trial judge is simply an employee, our analysis would be complete. Such "lesser functionaries"

---

**6.** As we discuss *infra,* any attempt by Congress to impose such a condition would be inconsistent with the overriding imperatives of the Appointments Clause. *Cf. Speiser v. Randall,* 357 U.S. 513, 528–29, 78 S.Ct. 1332, 1343–44, 2 L.Ed.2d 1460 (1958) (state cannot impose unconstitutional conditions on the availability of state created rights).

need not be selected in compliance with the strict requirements of Article II. *Buckley*, 424 U.S. at 126 n. 162, 96 S.Ct. at 685 n. 162.

The Commissioner argues that special trial judges are mere employees because they exercise limited authority. The Company, however, submits that the duties performed by the special trial judges are quite substantive and require the exercise of broad discretion. Indeed, the Company goes so far as to argue that, as currently utilized, special trial judges function as *de facto* judges of the Tax Court and should be viewed as principal officers subject to Presidential appointment and Senate confirmation. At a minimum, the Company asserts the special trial judges are inferior officers who must be appointed by the President, a "Court of Law," or a "Head of Department." To determine the appropriate manner of classifying the position of special trial judge, we must examine the structure of the Tax Court and the nature of the duties conferred on special trial judges.

▬▬ The Tax Court is wholly a creature of Congress and its nineteen judges are appointed by the President and subject to Senate confirmation. 26 U.S.C. § 7443. Thus, the judges of the Tax Court are plainly principal officers within the meaning of Article II. Although the line between inferior and principal officers is far from clear and the Framers provided little guidance, *Morrison v. Olson*, 487 U.S. 654, 671, 108 S.Ct. 2597, 2608, 101 L.Ed.2d 569 (1988), we find unpersuasive the Company's argument that the special trial judges are principal officers.

The Supreme Court in *Morrison* outlined four factors that must be examined to determine whether someone is a principal or an inferior officer: (1) the possibility of removal, (2) the scope of duties, (3) the scope of authority, and (4) the length of tenure. *Id.* at 671–72, 108 S.Ct. at 2608–09. In *Morrison,* the Supreme Court upheld the constitutionality of the provisions of the Ethics in Government Act of 1978, 28 U.S.C. §§ 591–599, which authorized the appointment of an independent counsel to

investigate and to prosecute high ranking government officials for violations of federal criminal laws. Specifically, in examining the statute's appointment provisions, the Court held that the independent counsel was not a "principal officer" under Article II. The Court, applying its four factor analysis, concluded that (1) the independent counsel was subject to removal by someone other than the President, (2) the duties of the office were limited, (3) the office's jurisdiction was restricted, and (4) the independent counsel's tenure was limited. *Id.*

Applying these criteria to the instant case, we conclude that a special trial judge is not a "principal officer." Special trial judges can be removed at anytime by the Chief Judge. The statute imposes no limitations on the power of the Chief Judge to remove any individual who is appointed as a special trial judge. The Chief Judge also has absolute control over the extent of the duties that are assigned to special trial judges. The statute at issue narrowly circumscribes the authority of the special trial judges. Indeed, in a section 7443A(b)(4) proceeding, the findings of a special trial judge, although subject to deference, can only be made final when adopted by a Division of the Tax Court. *See* Tax Court Rule of Practice and Procedure 183(c). Finally, in view of the above, a special trial judge's tenure is necessarily limited.

This conclusion does not end our analysis. A special trial judge may still be an inferior officer and, therefore, remain subject to the appointment provisions of Article II. As the Supreme Court has stated, "any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by § 2, cl. 2, of [Article II]." *Buckley*, 424 U.S. at 126, 96 S.Ct. at 685. The Tax Court concluded that the special trial judges are inferior officers. *First Western Securities*, 94 T.C. at 558–59. We agree.

Although the ultimate decisional authority in cases under section 7443A(b)(4) rests with the Tax Court judges, the special trial judges do exercise a great deal of authority

in such cases. The special trial judges are more than mere aids to the judges of the Tax Court. They take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders. Contrary to the contentions of the Commissioner, the degree of authority exercised by special trial judges is "significant." *See Buckley*, 424 U.S. at 126, 96 S.Ct. at 685. They exercise a great deal of discretion and perform important functions, characteristics that we find to be inconsistent with the classifications of "lesser functionary" or mere employee. *Cf. Go-Bart Importing Co. v. United States*, 282 U.S. 344, 352, 51 S.Ct. 153, 156, 75 L.Ed. 374 (1931) (United States commissioners are inferior officers).

### 3. *The Power to Appoint*

Having concluded that the special trial judges are "inferior Officers," we must now determine whether the Chief Judge of the Tax Court can constitutionally be vested with the power to appoint. The relevant language of the Appointments Clause bears repeating: "the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. Here, Congress clearly vested the Chief Judge of the Tax Court with the power to appoint special trial judges.[7] Although Congress has the authority to create offices and to provide for the method of appointment to those offices, "Congress' power ... is inevitably bounded by the express language of Art. II, § 2, cl. 2, and unless the method it provides comports with the latter, the holders of those offices will not be 'Officers of the United States.'" *Buckley*, 424 U.S. at 138–39, 96 S.Ct. at 691 (discussing Congress' power under the

Necessary and Proper Clause). Therefore, the fundamental issue is whether the Appointments Clause empowers Congress to vest the Chief Judge of the Tax Court with the power to appoint special trial judges. Resolution of this question necessarily involves close scrutiny of the language of the Appointments Clause. In this case, it is beyond question that Congress had no intention of placing the power to appoint special trial judges in the President. We, therefore, are left with three other possibilities.

First, as the Company argues, we could conclude that the Tax Court is neither a "Court of Law" nor a "Department" within the meaning of Article II.[8] Under this scenario, the appointment power could not be vested constitutionally in the Chief Judge of the Tax Court. Second, as the Commissioner submits, the Tax Court could be treated as a department, with the Chief Judge as the duly authorized head of that department.[9] Third, as *Amicus* urges, the Tax Court could be held to be a "Court of Law" within the meaning of Article II. In upholding the Chief Judge's authority to appoint special trial judges, the Tax Court adopted this third rationale. *First Western Securities*, 94 T.C. at 561–63.

The question of whether the phrase "Courts of Law," as it is used in the Appointments Clause, encompasses Article I courts is one of first impression. In examining this important question, therefore, we must focus primarily on the Constitution's language and structure. The existing Supreme Court precedent, however, does provide us with certain guideposts that can aid in our analysis.

### 4. *The Constitutional Framework*

Our inquiry into the provisions of Article II necessarily requires us to analyze the

---

**7.** 26 U.S.C. § 7443A(a) provides:
> The chief judge may, from time to time, appoint special trial judges who shall proceed under such rules and regulations as may be promulgated by the Tax Court.

**8.** The Company's arguments implicitly recognize the existence of a "fourth branch" within our constitutional framework. *See generally* Strauss, *The Place of Agencies in Government: Separation of Powers and the Fourth Branch*, 84 Colum.L.Rev. 573 (1984).

**9.** We note that in making this argument the Solicitor General, who is arguing on behalf of the Commissioner, abandoned the position that he advanced before the Tax Court below. Previously, it had been argued that the Tax Court was a "Court of Law." The Solicitor General now submits that he changed his legal arguments after further study of the issue.

very foundations of our system of government. In framing the Constitution, the Founding Fathers adopted a system of checks and balances to ensure that no one component of government would exercise too much power. To that end, " '[t]he Constitution sought to divide the delegated powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial.' " *Bowsher v. Synar*, 478 U.S. 714, 721, 106 S.Ct. 3181, 3185, 92 L.Ed.2d 583 (1986) (quoting *INS v. Chadha*, 462 U.S. 919, 951, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983)). As the Supreme Court has stated:

> The Framers provided a vigorous Legislative Branch and a separate and wholly independent Executive Branch, with each branch responsible ultimately to the people. The Framers also provided for a Judicial Branch equally independent with "[t]he judicial Power ... extend[ing] to all Cases, in Law and Equity, arising under this Constitution, and the Laws of the United States."

*Id.* 478 U.S. at 722, 106 S.Ct. at 3185–86 (quoting Art. III, § 2). This fundamental principle of separation of powers has for over 200 years protected the property and liberty of our nation's citizens. "The principle of separation of powers was not simply an abstract generalization in the minds of the Framers: it was woven into the document." *Buckley*, 424 U.S. at 124, 96 S.Ct. at 684.

Although the Constitution sought to distribute power among the three branches, "the Framers did not require—and indeed rejected—the notion that the three Branches must be entirely separate and distinct." *Mistretta v. United States*, 488 U.S. 361, 380, 109 S.Ct. 647, 659, 102 L.Ed.2d 714 (1989) (citations omitted); *see also Morrison*, 487 U.S. at 693–94, 108 S.Ct. at 2620 ("[W]e have never held that the Constitution requires that the three Branches of Government 'operate with absolute independence.' "). Over the years, the Supreme Court has consistently recognized that in order to maintain an effective government our constitutional framework requires a certain degree of interdependence among the branches. *Buckley*, 424

U.S. at 121, 96 S.Ct. at 683. The often quoted words of Justice Jackson emphasize this point:

> While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity.

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (concurring opinion).

Historically, separation of powers jurisprudence has focused on the extent to which one branch aggrandizes its power at the expense of another branch or encroaches on the authority specifically reserved for a co-equal branch. *Mistretta*, 488 U.S. at 412, 109 S.Ct. at 675 (placement of independent sentencing commission in judicial branch does not undermine authority of executive or legislative branches); *Morrison*, 487 U.S. at 695–96, 108 S.Ct. at 2621–22 (no aggrandizement of power where judicial branch appoints independent counsel); *Bowsher*, 478 U.S. at 734, 106 S.Ct. at 3192 (Congress' retention of power to remove an officer performing executive functions results in aggrandizement of legislative power); *Chadha*, 462 U.S. at 957–59, 103 S.Ct. at 2787–88 (one house legislative veto infringes on powers of executive). In each of these cases, the Supreme Court sought to balance the pragmatic concerns associated with the operation of an effective and efficient government with the institutional concern of remaining faithful to the fundamental governmental structure that the Framers incorporated into the Constitution. *See generally* Carter, *Constitutional Improprieties: Reflections on* Mistretta, Morrison, *and Administrative Government*, 57 U.Chi.L.Rev. 357 (1990) (deference to the governmental structure adopted by Framers is essential to maintenance of our constitutional framework and concerns of administrative convenience should not drive separation of powers analysis). The instant case requires us to struggle with these same competing principles. Although a pragmatic approach is

often preferable, particularly where, as here, the potential for disruption to our constitutional scheme is minimal, we must be careful not to ignore the textual provisions of the Constitution and the principles they embody.

■ The principle of separation of powers is embedded in the Appointments Clause. *See Buckley*, 424 U.S. at 124–25, 96 S.Ct. at 684–85; *but see* Blumoff, *Separation of Powers and the Origins of the Appointment Clause*, 37 Syracuse L.Rev. 1037, 1078 (1987) (Appointments Clause nothing more than the product of a political compromise and it should not be understood to reflect a consensus on the proper distribution of governmental power). That clause designates three repositories in which the Congress can place the power to appoint: "in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. Thus, the Appointments Clause only vests Congress with the authority to distribute the appointment power; Congress cannot reserve for itself the power to appoint. *See Buckley*, 424 U.S. at 132–33, 96 S.Ct. at 688–89. Similarly, Congress cannot reserve for itself the power to remove the appointee. *Bowsher*, 478 U.S. at 726, 106 S.Ct. at 3188. Of the three potential repositories of the appointment power, two— the President and heads of departments— are in or at least connected with the Executive Branch, *id.* at 127, 96 S.Ct. at 686, and the remaining one—"Courts of Law"—has been interpreted to be in "the Judiciary." *Id.* at 132, 96 S.Ct. at 688.

With these fundamental principles in mind, we direct our attention to the Company's specific challenge: Can the Chief Judge of the Tax Court constitutionally be vested by Congress with the power to appoint?

(a) *Court of Law*

The Company and the Commissioner assert that Article II's reference to "Courts of Law" is necessarily limited to courts created pursuant to Article III and that, therefore, the Chief Judge of the Tax Court, a non-Article III judge, constitutionally cannot be vested with the power to appoint under this designation. *Amicus* argues that this is too narrow a reading of Article II. He submits that the phrase "Courts of Law" means any court authorized by Congress to adjudicate cases.[10] *Amicus* points out that Article I confers on Congress the power "[t]o constitute Tribunals inferior to the supreme Court." U.S. Const. art. I, § 8, cl. 9. All the parties acknowledge that the creation of such "legislative courts" is constitutionally valid. *See Crowell v. Benson*, 285 U.S. 22, 50–51, 52 S.Ct. 285, 292, 76 L.Ed. 598 (1932) (under Article I Congress can establish courts to adjudicate public rights—rights which arise between governmental agencies and the citizens subject to the authority of these bodies); *Bakelite*, 279 U.S. at 451, 49 S.Ct. at 413 (legislative courts may be used to determine matters that "do not require judicial determination and yet are susceptible of it"); *American Ins. Co. v. Canter*, 26 U.S. (1 Pet.) 511, 546, 7 L.Ed. 242 (1828) (Congress has the authority under Article I to create territorial courts that are not vested with the "judicial power" defined in Article III). *Amicus* goes one step further, however, and asserts that there can be little doubt that these Article I courts are "Courts of Law" within the meaning of Article II. In support of this proposition, *Amicus* points to the functions performed by the Tax Court and Congress' history of vesting Article I courts with the authority to appoint certain officers. We reject *Amicus'* arguments.

The provisions of Article II incorporate the principle of separation of powers, permitting the Congress to place the appointment power in the President, a head of department, or the "Courts of Law." The Constitution also gives the Congress a di-

---

**10.** The task of navigating through the murky waters that surround this area of constitutional law is a difficult one. As the Supreme Court has recognized, a concise and direct analysis of the issues surrounding the distinctions between Article III and Article I courts is extremely diffi-cult because this area of constitutional law is plagued by "frequently arcane distinctions and confusing precedents." *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 90, 102 S.Ct. 2858, 2881, 73 L.Ed.2d 598 (1982) (Rehnquist, *J.*, concurring).

rect role in the appointments process by requiring the advice and consent of the Senate for the appointment of principal officers.

■ In identifying the "Courts of Law" as a potential repository of the appointment power, there is no indication that the Framers contemplated any courts other than those provided for under Article III. Indeed, Article III contains the Constitution's only other use of the term "courts." Moreover, in interpreting the Appointments Clause, the Supreme Court has declared that inferior officers can be appointed only by "the President alone, by the heads of departments, or by the *Judiciary.*" *Buckley,* 424 U.S. at 132, 96 S.Ct. at 688 (emphasis added). The Supreme Court's consistent use of the term "Judiciary" emphasizes that Article II's reference to "Courts of Law" solely encompasses Article III courts. "The Federal Judiciary was ... designed by the Framers to stand independent of the Executive and Legislature—to maintain the checks and balances of the constitutional structure, and also to guarantee that the process of adjudication itself remained impartial." *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 58, 102 S.Ct. 2858, 2864, 73 L.Ed.2d 598 (1982) (plurality opinion). The term "Judiciary" refers exclusively to those judges appointed in conformity with the requisites of Article III—life tenure and no diminution of salary. *Id.* at 59–60 & n. 10, 102 S.Ct. at 2865 & n. 10. Only courts that possess the attributes prescribed in Article III can exercise the "judicial power" of the United States. *Id.* at 59, 102 S.Ct. at 2865. Although the Supreme Court has subsequently clarified certain statements made by the plurality in *Northern Pipeline, see Thomas v. Union Carbide Agric. Products Co.,* 473 U.S. 568, 584–86, 105 S.Ct. 3325, 3334–36, 87 L.Ed.2d 409 (1985), the Court has not undermined the proposition that the term "Judiciary" refers exclusively to Article III courts.[11]

In pressing the argument that the Tax Court is a "Court of Law," *Amicus* emphasizes that in several instances Congress has vested Article I courts with the power to appoint. For example, Congress vested several territorial and specialized courts with the power to appoint inferior officers—such as clerks and commissioners. *See* Act of June 4, 1812, ch. 95, § 10, 2 Stat. 743, 746 (giving Missouri territorial court the power to appoint a clerk); Act of May 2, 1890, ch. 182, § 9, 26 Stat. 81, 86 (Oklahoma) (same); Act of June 6, 1900, ch. 786, § 6, 31 Stat. 321, 323 (Alaska) (same); Act of Feb. 24, 1855, ch. 122, §§ 3, 11, 10 Stat. 612, 613–14 (vesting Claims Court, which at the time was considered an Article I court, with power to appoint commissioners and a clerk). *Amicus* asserts that this tradition establishes that such bodies are "Courts of Law" within the meaning of the Appointments Clause. While we view this historical practice to be evidence that Article I courts can constitutionally be vested with the power to appoint, we do not believe that it necessarily establishes that such courts are permitted to be vested with this power because they are "Courts of Law" under Article II. *See Mistretta,* 488 U.S. at 401, 109 S.Ct. at 669 ("'traditional ways of conducting government ... give meaning' to the Constitution") ((quoting *Youngstown Sheet & Tube,* 343 U.S. at 610, 72 S.Ct. at 897) (concurring opinion)).

---

**11.** Although Congress plainly has the authority under Article I to create legislative courts, such as the Tax Court, it is equally clear that such courts lack the requisites of Article III status. The cases which have recognized the legitimacy of legislative courts have been careful to distinguish such courts from "constitutional courts, in which the judicial power conferred by the constitution on the general government, can be deposited." *American Ins. Co. v. Canter,* 26 U.S. (1 Pet.) 511, 546, 7 L.Ed. 242 (1828); *see also Ex Parte Bakelite Corp.,* 279 U.S. 438, 449–50, 49 S.Ct. 411, 412–13, 73 L.Ed. 789 (1929); *Crowell v. Benson,* 285 U.S. 22, 50, 52 S.Ct. 285, 292, 76 L.Ed. 598 (1932). The Court's recent reluctance to make any definitive statements regarding the jurisdictional tension between Article III and Article I courts does not undermine the fundamental proposition that Article I and Article III courts stand on a different constitutional footing. *See Thomas v. Union Carbide Agric. Products Co.,* 473 U.S. 568, 585–87, 105 S.Ct. 3325, 3335–36, 87 L.Ed.2d 409 (1985); *see generally* Note, *Formalism and Functionalism: From* Northern Pipeline *to* Thomas v. Union Carbide Agricultural Products Co., 37 Syracuse L.Rev. 1003 (1986).

It is equally probable, as we discuss *infra*, that these Article I courts were viewed as a department. In any event, Congress' vesting these "courts" with the power to appoint does not make the placement of that power necessarily constitutional.

 *Amicus* encourages us to treat as secondary the formal constitutional distinctions between Article I and Article III. Instead, he suggests focusing on the functions performed by the Tax Court. *Amicus* reasons that because the Tax Court adjudicates disputes it must therefore be a "Court of Law." We do not dispute *Amicus'* factual assertions. Indeed, we acknowledge that the Tax Court performs many functions similar to those performed by Article III courts. The judges of the Tax Court hear evidence, make rulings, review briefs, and render opinions that are binding on the parties and appealable to the Court of Appeals. These facts, however, do not necessarily lead to the conclusion that the Tax Court is a "Court of Law" as the term is used in the Appointments Clause. It is not enough merely to focus on the nature of the function being performed. *See Mistretta*, 488 U.S. at 386, 109 S.Ct. at 661. Very often administrative agencies that are in or associated with the executive branch perform adjudicatory functions. *See Schor*, 478 U.S. at 850–54, 106 S.Ct. at 3256–3259. One need only consider the operation of the Social Security Administration to recognize that our system of government is replete with instances of administrative agencies performing adjudicatory functions. *See, e.g., Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). As Justice Brandeis once explained, the principle of separation of powers "left to each [Branch] power to exercise, in some respects, functions in their nature executive, legislative and judicial." *Myers v. United States*, 272 U.S. 52, 291, 47 S.Ct. 21, 84, 71 L.Ed. 160 (1926) (dissenting opinion). Certainly administrative agencies are not "Courts of Law," as that term is used in Article II, simply because they perform adjudicatory functions. A purely functional analysis, therefore, fails adequately to consider the importance of the Constitution's framework and often would lead to untenable results.

 Despite the functional nature of the Tax Court and the fact that Article I courts historically have been vested with the power to appoint, we conclude, in light of the language of the Appointments Clause and the structure of the Constitution, that the Tax Court is not a "Court of Law" within the meaning of Article II.

### (b) *Department*

 Having concluded that the Tax Court is not a "Court of Law" within the meaning of the Appointments Clause, we must now determine whether the Tax Court is a "department" of which the Chief Judge is the "head," an argument advanced by the Commissioner but rejected by both the Company and *Amicus*. We find the argument advanced by the Commissioner to be persuasive.

We begin by repeating that the nature of the duties performed by an office does not determine where the appointment power for such an office can be properly placed. For instance, an officer's performance of traditionally recognized executive functions—such as prosecution—does not mean that he or she must be appointed by the executive. *See Morrison*, 487 U.S. at 675–77, 108 S.Ct. at 2610–11 (power to appoint special prosecutor can be vested in Article III court). As the Supreme Court has counselled, we should not give undue emphasis to the nature of the duties assigned to a particular office.

> It is no doubt usual and proper to vest the appointment of inferior officers in that department of the government, executive or judicial, or in that particular executive department to which the duties of such officers appertain. But there is no absolute requirement to this effect in the Constitution; and, if there were, it would be difficult in many cases to determine to which department an office properly belonged.

*Ex Parte Siebold*, 100 U.S. 371, 397, 25 L.Ed. 717 (1880). The question where to place the Tax Court in our constitutional

scheme leads us to an examination of the history of the Tax Court.

The United States Tax Court was originally established by an Act of Congress in 1924 as the Board of Tax Appeals and was designated as "an independent agency in the executive branch of the Government." Revenue Act of 1924, ch. 234, § 900(a), (k), 43 Stat. 336, 338. In 1942, Congress changed the name of the Board of Tax Appeals to the "Tax Court of the United States." Revenue Act of 1942, ch. 619, § 504, 56 Stat. 798, 957. Its designation as an independent agency within the Executive Branch, however, was not changed. Indeed, this designation continued until Congress enacted the Tax Reform Act of 1969, P.L. 91–172, tit. IX, § 951, 83 Stat. 487, 730 (codified as amended at 26 U.S.C. § 7441). That provision provided:

> There is hereby established, under article I of the Constitution of the United States, a court of record to be known as the United States Tax Court.

*Id.* Congress' passage of the 1969 Tax Reform Act renaming this adjudicatory body the United States Tax Court does not in itself lead to the conclusion that Congress removed this body entirely from the Executive Branch. Likewise, we do not find the legislative history to indicate definitively where in our constitutional scheme Congress intended to place this adjudicatory body. The legislative history regarding the Tax Act of 1969 is rather limited. The Senate Report does demonstrate that Congress intended to cease classifying the Tax Court as an agency within the Executive Branch. S.Rep. No. 552, 91st Cong., 1st Sess. 301, *reprinted in* 1969 U.S.Code Cong. & Admin.News 1645, 2027, 2340–41. While it is clear that Congress intended to establish a "court" pursuant to its Article I authority, it is equally apparent that Congress realized that this Article I forum lacked the requisites of Article III status. *See generally id.* at 2343 n. 3. The source from which the Chief Judge's appointment power was to be derived, however, is unclear. The lack of congressional clarity on the specific issue now before us is not surprising. Since the New Deal era, the "administrative state" has become an accepted and necessary element of our government. As yet, our constitutional precedent has failed to address specifically all the ramifications that stem from the continuing evolution in our governmental structure. For the reasons that we discuss *infra*, we believe that Congress' desire to create a "court" is not inconsistent with the conclusion that for purposes of the Appointments Clause the Tax Court is a department associated with the Executive Branch.

Several factors lead us to conclude that the Tax Court remains a department associated with the Executive Branch. First, in examining the Founders' use of the phrase "Heads of Departments," the Supreme Court has explained: "The phrase 'Heads of Departments,' used as it is in conjunction with the phrase 'Courts of Law,' suggests that the Departments referred to are themselves in the Executive Branch or at least have some connection with that branch." *Buckley*, 424 U.S. at 127, 96 S.Ct. at 686. This explanation is particularly applicable to the Tax Court. The Tax Court serves as a forum to challenge tax deficiencies as determined by the Commissioner. The Internal Revenue Service is clearly within the province of the Executive Branch, specifically the Department of Treasury. Thus, in this respect, it can be said that the Tax Court "has some connection with [the Executive Branch]." This conclusion is further supported by Congress' decision to place the predecessor to the Tax Court in the Executive Branch. In adopting the 1969 amendments, Congress explained: "The United States Tax Court established under the amendment made by section 951 is a continuation of the Tax Court of the United States as it existed prior to the date of enactment of this Act." Tax Reform Act of 1969, P.L. 91–172, tit. IX, § 961, 83 Stat. 487, 735. Thus, Congress did little more than change the label to be used when referring to this alternative forum for the resolution of tax disputes. We do not think that the label that Congress chooses to give an adjudicatory body determines its constitutional status.

To so hold would render many of the Constitution's provisions superfluous.

■ Second, it is well established that Congress can provide for the adjudication of "public rights" in Article I courts. Public rights are those rights that arise "between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments." *Crowell*, 285 U.S. at 50, 52 S.Ct. at 292. The "public rights doctrine" has its basis in the principle of separation of powers, and the "historical understanding that certain prerogatives were reserved to the political Branches of Government." *Northern Pipeline*, 458 U.S. at 67, 102 S.Ct. at 2869. Indeed, the rationale underlying this understanding is that since Congress would be free to commit such matters exclusively to the Executive Branch for resolution, Congress can employ "the less drastic expedient of committing their determination to a legislative court or an administrative agency." *Id.* at 68, 102 S.Ct. at 2870. As the Supreme Court has summarized:

In essence, the public rights doctrine reflects simply a pragmatic understanding that when Congress selects a quasi-judicial method of resolving matters that "could be conclusively determined by the Executive and Legislative Branches," the danger of encroaching on the judicial powers is reduced.

*Thomas*, 473 U.S. at 589, 105 S.Ct. at 3337 (quoting *Northern Pipeline*, 458 U.S. at 68, 102 S.Ct. at 2870).

■ The Tax Court is the classic example of a forum that adjudicates "public rights." The relationship between the government and taxpayer plainly gives rise to public rights and we have no doubt that the resolution of such disputes can be relegated to a non-Article III forum. *Crowell*, 285 U.S. at 50–51, 52 S.Ct. at 292; *Bakelite*, 279 U.S. at 450–51, 49 S.Ct. at 413; *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284, 15 L.Ed. 372 (1856).

The "public rights" doctrine rests on the premise that any matters subject to adjudication in Article I forums could have been conclusively determined by the executive or legislative branches in the first instance. *See Thomas*, 473 U.S. at 589, 105 S.Ct. at 3337; *Northern Pipeline*, 458 U.S. at 67–69, 102 S.Ct. at 2869–70; *Bakelite*, 279 U.S. at 451–53, 49 S.Ct. at 413–14; *see also* Strauss, *supra* note 6, at 632 ("the whole point of the [traditional] 'public rights' analysis" has been "that *no judicial involvement at all* was required—executive determination alone would suffice"). Given the fact intensive nature of tax disputes, resolution of such claims would ordinarily be left to the executive. *See* Redish, *Legislative Courts, Administrative Agencies, and the* Northern Pipeline *Decision*, 1983 Duke L.J. 197, 213 (1983). Thus, we find it entirely consistent with the reasoning underlying the "public rights" doctrine to treat the Tax Court as a department associated with the Executive Branch.

Third, legislative courts, such as the Tax Court, share many of the characteristics of administrative agencies. We believe that the work performed by legislative courts and adjudicatory agencies cannot be distinguished. *Id.* at 201. Both are bodies created by Congress under Article I to adjudicate federal rights and both lack the requisites of Article III status. "[F]rom the perspective of Article III, [there is] no difference in constitutional principle between legislative courts and administrative agencies." Fallon, *Of Legislative Courts, Administrative Agencies, and Article III*, 101 Harv.L.Rev. 915, 928 (1988) (citations omitted); *see also Northern Pipeline*, 458 U.S. at 113, 102 S.Ct. at 2893 (White, *J.*, dissenting) (noting that many Article I courts "go by the contemporary name of 'administrative agencies' "); Sommer, *Independent Agencies as Article One Tribunals: Foundations of a Theory of Agency Independence*, 39 Admin.L.Rev. 83, 98–100 (1987) (advocating treating independent agencies as Article I courts, yet recognizing that the constitutional status of both remains unclear); Miller, *Independent Agencies*, 1986 Sup.Ct.Rev. 41, 50 (noting that the term "independent agency" has never been conclusively defined and that Article I courts can properly be categorized

in this manner); Redish, *supra,* at 201 ("Court cannot logically distinguish the work of non-Article III legislative courts from that of administrative adjudicatory bodies. Despite several differences in both appearance and operation, their work cannot be functionally or theoretically distinguished."). As one scholar has aptly explained:

> The members of administrative agencies do not wear robes or retain the other traditional indicia of judicial office. Nevertheless, these agencies are analogous to legislative courts because, although they may and often do perform adjudicatory functions, their members do not receive the salary and tenure protections of Article III.

Redish, *supra,* at 214. We, therefore, think it entirely consistent with the text of the Constitution and the existing precedent to treat Article I creatures, like the Tax Court, as departments, particularly where as here the matters being adjudicated could have been left to executive resolution.

Fourth, historically when analyzing Appointments Clause arguments, the Supreme Court has focused its attention on the question of which branch retains the authority to remove a particular officer. *See, e.g., Bowsher,* 478 U.S. at 724–26, 106 S.Ct. at 3187–88; *Wiener v. United States,* 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958); *Myers v. United States,* 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926). Here, the judges of the Tax Court are appointed by the President and removable by him, albeit only "after notice and opportunity for public hearing, for inefficiency, neglect of duty, or malfeasance in office, but for no other cause." 26 U.S.C. § 7443(f); *compare* U.S. Const. art. III, § 1 (Article III judges serve during "good Behavior"). Thus, although insulated to a large extent, the judges of the Tax Court ultimately remain answerable to the President and are not wholly divorced from his oversight. In this regard, the analogy between the Tax Court and administrative agencies becomes even stronger. The principal officers of some agencies are presidentially appointed and serve for a term of years and are not removable at the will of the President. *See*

*Humphrey's Executor v. United States,* 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935) (holding that Congress can limit the President's removal power over independent agencies). While not having been subject to constitutional challenge, the principal officers of such independent agencies have been presumed to be proper repositories of the appointment power. *See, e.g.,* 7 U.S.C. § 4a(e) (vesting the members, including the chairman, of the Commodities Future Trading Commission with the power to appoint); 15 U.S.C. § 78d(b) and Reorganization Plan No. 10 of 1950, effective May 24, 1950, 15 F.R. 3175, 64 Stat. 1265 (placing the power to appoint in the chairman of the Securities and Exchange Commission). Although such agencies have been deemed to be "independent" of the executive, they remain affiliated with the Executive Branch. *See generally* Note, *Incorporation of Independent Agencies into the Executive Branch,* 94 Yale L.J. 1766 (1985) (arguing for increased executive control over "independent agencies"). Adopting the pragmatic approach endorsed by the Supreme Court in *Mistretta, Thomas* and *Morrison,* we conclude that legislative courts, like administrative agencies, are for purposes of the Appointments Clause most appropriately characterized as "departments" associated with the Executive Branch.

Finally, section 7443A places the power to appoint special trial judges in the Chief Judge of the Tax Court. 26 U.S.C. § 7443A(a). Congress chose to place the power in a specified office and not in the Tax Court itself. *Compare* 28 U.S.C. § 631(a) (placing power to appoint United States magistrates in all of the judges of each United States District Court); 28 U.S.C. § 152 (vesting United States Court of Appeals with the power to appoint bankruptcy judges). Clearly Congress knows how to place the appointment power in a judicial body as opposed to a particular office. Although not in itself definitive, we conclude that the decision by Congress to vest the Chief Judge, a particular office, instead of the Tax Court itself, with the power to appoint, further supports the con-

clusion that the Tax Court is a "department" and the Chief Judge is the "head" of that department for purposes of the Appointments Clause.

Arguing on behalf of the Commissioner, the Solicitor General, in response to one of our questions, frankly acknowledged that the day-to-day operations of government would not be impacted negatively if we were to conclude that the Tax Court was a "Court of Law." This concession alone, however, cannot lead us to ignore the Constitution and the existing precedent. While the issue before us is not susceptible to easy analysis, we are convinced that our holding is consistent with the nation's constitutional framework and the practical considerations of managing the operations of our contemporary government.

## CONCLUSION

Our review of the language and legislative history of section 7443A of Title 26 leads us to conclude that Congress, when it used the phrase "any other proceeding," intended to authorize the assignment of complex tax cases that involve large amounts in controversy to special trial judges. We also hold that the Tax Court is a "department" with the Chief Judge as its "head" within the meaning of the Appointments Clause. In reaching this latter result, we have sought to balance the competing values of remaining loyal to the Constitution's framework and the pragmatic concerns of effectively governing this nation. In sum, we hold that section 7443A is not constitutionally infirm. Our opinion should not be read to cast a shadow on the constitutional legitimacy of Article I courts. The constitutionality of such forums is undoubted. Rather, our decision stands for the limited proposition that the Tax Court is not a "Court of Law" within the meaning of the Appointments Clause, but is instead a department associated with the Executive Branch. Accordingly, we affirm the decision of the Tax Court, but on a different rationale.