Susan Ross **GREEN** as Executrix of the Estate of Walter Green, deceased, Susan Ross Green, and Alixandra Green, an infant, by her Mother and Natural Guardian, Susan Ross Green,* Plaintiffs–Appellants,

v.

**CITY OF NEW YORK, Paul Giblin, and St. Luke's–Roosevelt Hospital Center, Defendants–Appellees.**

Docket No. 04–1006–cv.

United States Court of Appeals, Second Circuit.

Argued: Dec. 15, 2004.

Decided: Oct. 5, 2006.

band, we direct the Clerk to amend the caption accordingly.

Elisa Barnes, Law Office of Elisa Barnes, New York, NY, for Plaintiffs–Appellants.

Scott Shorr, Assistant Corporation Counsel for the City of New York (Michael A. Cardozo, Corporation Counsel, and Ron E. Sternberg, Assistant Corporation Counsel, on the brief), New York, NY, for Defendants–Appellees Paul Giblin and City of New York.

Michael P. Kelly, Schiavetti, Corgan, Soscia, DiEdwards & Nicholson, LLP, White Plains, NY, for Defendant–Appellee St. Luke's–Roosevelt Hospital Center.

Before POOLER and KATZMANN, Circuit Judges.**

POOLER, Circuit Judge.

This appeal stems from a decision by the individual defendant, New York City Fire Department Lieutenant Paul Giblin, to transport Walter Green ("Walter") to a hospital without evaluating whether Walter was competent to refuse treatment or whether he had done so. On March 19, 2000, Walter, whose amytrophic lateral sclerosis ("ALS") had progressed to the point that he could not breathe on his own, was at home with an assistant, Marcella Lopez, when his mechanical respirator stopped working properly. Because neither Lopez nor Walter's fourteen-year-old daughter, Alixandra, was initially able to locate the ambu-bag used to manually assist Walter with breathing, they blew air into Walter's trachea tube. Alixandra also called 911 for assistance, but while she was still on the phone, Susan Green ("Susan"),

---

** Judge Raggi, a member of the panel who heard oral argument, subsequently recused herself. Therefore, this case is decided by the two remaining members of the panel pursuant to Section 0.14(b) of the Rules of the United States Court of Appeals for the Second Circuit.

Alixandra's mother and Walter's wife, returned to the apartment and located the ambu-bag. The three women then succeeded in restoring Walter to consciousness and competence.

After Walter became conscious, several emergency personnel from the New York City Fire and Police Departments and St. Luke's–Roosevelt Hospital ("St.Luke's") came to the Greens' apartment. One of the last to arrive, Lieutenant Giblin, overrode objections from Susan, Alixandra, a family friend, and Walter himself, and ordered that Walter be transported to St. Luke's.

Against this difficult background, which, on this appeal from a grant of summary judgment, incorporates the evidence and adopts the inferences most favorable to plaintiffs, we must answer five primary questions: (1) whether Walter had a right under the Fourth Amendment to the United States Constitution to be free of the seizure that occurred when he was transported to St. Luke's; (2) if so, whether the contours of Walter's Fourth Amendment right were sufficiently established on March 19, 2000, that a reasonable municipal employee would have known that he had such a right; (3) whether Walter had a right under the Fourteenth Amendment to decline to be taken to St. Luke's; (4) if so, whether this right was sufficiently clear and established to defeat the individual defendants' claim of qualified immunity; and (5) whether there is sufficient evidence in the record to require a trial on Walter's claim that the defendants violated the New York Human Rights Law ("HRL"), N.Y. Executive Law § 290 et seq., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq, by failing to assess his competence to decline treatment. The appeal also requires us to resolve issues of municipal and employer liability.

## BACKGROUND

*The Facts.*

As we must in reviewing a grant of summary judgment, we view the facts in the light most favorable to plaintiffs and draw from those facts every favorable inference that a reasonable fact-finder could draw. *See Anthony v. City of New York,* 339 F.3d 129, 134 (2d Cir.2003).

Walter was first diagnosed with ALS, a neuro-muscular disease, in 1993. By 1997, he was using a mechanical respirator. Even after he began using the respirator, Walter continued athletic activities including wheelchair marathons. Walter was also a long-term advocate for the needs of those with disabilities.

When Walter began using the respirator, his family members were trained in the use of the various machines and devices that Walter's care required including an ambu-bag, a bag that fit into Walter's trachea tube and could be used for manual ventilation when the mechanical ventilator was not working. Between 1997 and the incident in March 2000, Walter's mechanical ventilator malfunctioned four times. On one occasion, the ventilator malfunctioned in the middle of an airline flight to Germany. By taking turns using the ambu-bag for three and a half hours, Susan, Alixandra, and a stewardess were able to provide sufficient oxygen to Walter, and he suffered no adverse health consequences. Family members also used the ambu-bag to help Walter breathe when his digestive processes required so much energy that the mechanical ventilator provided insufficient oxygen.

On March 19, 2000, Walter had pneumonia. At some point, Susan and Alixandra left the apartment, leaving Lopez to care for Walter. After they left, Walter began feeling light-headed. Lopez noticed Wal-

ter's distress, called Susan, and told her that "Walter [was] feeling bad" and that Susan should return. Although it appeared that the ventilator was working, Lopez also asked Walter if he was getting enough air. When he replied, "no," Lopez began blowing into Walter's tube as she had been taught by Shirley Barboza, Walter's regular attendant.[1]

Alixandra arrived at the family apartment approximately ten minutes after Lopez's call. She found her father passed out with his eyes rolled back, his skin green, and his face cold. Lopez was "breathing for him [by] blowing into his trache [a] to give him air." Alixandra assisted Lopez by taking turns blowing into her father's trachea. The two also took turns suctioning mucus from Walter. Alixandra looked for the ambu-bag but was unable to find it. Within five minutes of Alixandra's arrival, Lopez told the teenager to call 911.

The transcript of the tape between Alixandra and 911 indicates that the conversation began at 2:40 p.m with Alixandra telling the operator that her father was having trouble breathing because his ventilator was not working. Alixandra also said "we need help," and the operator indicated an ambulance was on the way. Later in the conversation, Alixandra said that her father was dying, and the emergency operator said, "He's breathing so calm down she can stop screaming." Alixandra then dropped the telephone, so that she could try to fix the ventilator.[2]

About five minutes after Alixandra arrived at the apartment, her mother returned and found the ambu-bag. With use of the ambu-bag and suctioning, Walter returned to consciousness and regained his usual color in less than five minutes. Asked if he was all right, Walter blinked twice, his signal for "yes." He then blinked five times, which was his code for "I love you. Don't worry." He also entered "I'm OK" with one finger on his laptop, which spoke the words for him. When Walter returned to consciousness, he noticed only his wife and daughter in the apartment. He was able to think clearly within five minutes of his revival.

After Walter regained consciousness, St. Luke's Emergency Medical Service personnel and police officers came to the apartment. One officer asked Walter if he wanted to go to the hospital. Walter blinked "no," and repeated on his computer "no, because I fine." The computer spoke the words out loud. Walter repeated his desire not to be hospitalized many times as did his wife. Susan also explained Walter's eye-blinking system in which one blink meant "no," and two blinks meant "yes," as well as his computerized method of communication. St. Luke's paramedic Chris Collins ignored Susan's explanation that Walter could communicate by blinking and "could answer for himself if Mr. Collins would only come and look." Susan also thanked the officers for coming but explained that the family had things under control now. In the face of Susan's claim that Walter was now all right, Collins said that he would be the judge of Walter's condition.

At around 3:12 p.m., Collins called the FDNY's Medical Control system ("telemetry"), which allows on-the-scene emergen-

---

1. Lopez did not use the ambu-bag as she had been instructed because it was not in its usual place.

2. At some point, it appears that Lopez either joined or replaced Alixandra on the phone. Thus it is unclear who actually made certain

statements. It is irrelevant to our analysis which of the two made particular comments. Therefore, and for the sake of simplicity, we assume that all of the statements we have quoted were made by Alixandra.

cy personnel to talk to a paramedic who, in turn, has access to a physician. Telemetry physicians can help responders evaluate whether a refusal to accept medical assistance has been competently made. He said:

> Okay here's my situation. . . . It's a 60–year old male who has a history of Lou Gehrig's disease. . . . The patient's vent had died. . . . When we got there the patient's family was bagging him. The patient is septic. . . . We initiated [treatment] and the patient's family does not wish to allow him to be removed from the residence. . . .

The telemetry operator asked Collins if Walter could talk, and Collins responded, "he's got a trachea and he is being bagged he can communicate via computer." The telemetry operator then said: "Are they are—well that's not going to help us." Later the operator reported to Collins that the "doc" had said, "standby for the lieutenant and see what he can get you know get done from there."

An EMS report reflects that Walter "start[ed] to respond via eye contact and tr[ied] to communicate by laptop computer" at 3:20 p.m. A Fire Department report states that "around [3:20 p.m.] [patient] became alert communicating via computer and winks."

At 3:29, other officers including Giblin, came to the apartment. Giblin announced that he was in command and told Susan: "[w]e are taking him in." At that time, the words "no hosp" still appeared on Walter's computer screen. However, when Susan asked to call Bill Hill, Walter's respiratory therapist, Giblin told her to go ahead. Susan informed Hill that "[they] were ambu[ ]-bagging Walter, that there was some time when he was unconscious, that he was fine now, and that his oxygen level was 97." Based on this information, Hill considered Walter's oxygen saturation to be acceptable. Giblin then spoke to Hill who told him he was on his way.[3] When Giblin got off the phone, he said "He's in Lake Success. That is 45 minutes away. That is too long. We can't wait for him." Susan replied, "Maybe you should leave," and "we will just wait for him," but Giblin refused to leave. Susan begged Giblin to ask Walter questions, so that he could observe his answers, but Giblin refused to look at Walter.

Susan also called Joan Bertin, a family friend and attorney, who arrived at the Greens' apartment less than fifteen minutes later. By the time Bertin arrived, Alixandra had erected a makeshift barrier of furniture to keep the St. Luke's and City personnel from moving Walter from the apartment. Bertin looked at Walter, and asked if he was ok, and he blinked that he was. She observed that "he was conscious and alert and his skin color was okay." Bertin then asked Walter if he wanted to go to the hospital, and Walter blinked "no." Bertin confirmed with one of the EMS technicians that Walter had declined treatment and was alert and conscious. Bertin also told Giblin that Walter was alert, conscious and competent, and Giblin did not dispute this characterization. Giblin refused Bertin's request to speak to a supervisor as well as her request that he talk further to Hill.[4] Finally, Bertin asked Giblin, "If Walter could talk and say no, he didn't want to go, would you still take him?" Giblin replied that he would not.

---

3. Giblin, however, denied in his deposition that he had ever spoken to Hill, and stated that at the time, he had "no idea how close" Hill was to the apartment.

4. Giblin denied that he knew Walter could communicate by blinking or by computer. He also denied that Bertin told him that Walter was alert, conscious, and communicating.

Giblin was apparently sent to the Greens' apartment, pursuant to the New York City Fire Department ESMC OGP 106–04 (June 30, 1999) (the "Guidelines") because telemetry services could not evaluate Walter's decision-making capacity. The Guidelines, which contain procedures for evaluating refusals to accept medical assistance, provide that, in order to refuse medical treatment, a patient must be alert, oriented to time, place, and person, and have the ability to understand his medical condition, the possible risks or consequences resulting from refusal to accept medical aid, and treatment and transportation issues. *Id.* § 3.4. The patient must also have "[t]he ability to communicate, verbally or non-verbally, the foregoing." *Id.* § 3.4.4. Where on-the-scene personnel believe the patient needs medical treatment but cannot secure his consent, they are instructed to contact telemetry. *Id.* §§ 5.1–5. If the telemetry operator is unable to reach a physician and is "unable to make an accurate determination of the patient's decisional capacity," it should "coordinate efforts with the crew using the prescribed Refusal of Medical Aid Questionnaire to expedite a correct patient transportation decision." *Id.* § 5.4.6(D) If an EMS command supervisor, such as Giblin, is at the scene, he or she must accept a competent person's refusal to accept medical treatment after making efforts to persuade the person to accept treatment. *Id.* § 5.5.7.

Giblin, however, saw his role quite differently. He testified that he was advised by his dispatcher "[t]hat the crew had a patient that needed to be removed and that the family was interfering with patient care." He also claimed that the St. Luke's paramedics told him that "they spoke to telemetry, that telemetry told them that since the patient could not speak to them, they could not relay the information back and forth, and they should transport the patient." Neither paramedic recalled this conversation, and Giblin's account is inconsistent with the telemetry tape, which reflects only that a supervisor would be sent to the scene. Giblin believed that Walter was "in extremis and incredible condition because he was being bagged." He acknowledged, however, that, if Walter's ventilator had been working, he would not have been in extremis, because not being able to breathe on his own was his normal state. Giblin also acknowledged that he made no attempts to communicate with Walter, explaining that the crew told him Walter could not communicate. He added: "If he's not able to speak to the doctor, he is not communicating." He made the decision to transport Walter because Walter "was not able to breathe for himself." Giblin could not tell whether Walter was oriented to time, place, and person, and did not assess his decisional capacity.

Once Giblin decided that Walter must be transported, the officers began moving toward him. Susan also began to move toward Walter, and an officer's watch caught her lip, causing her to bleed. She also was "knocked down," but did not say who knocked her down or whether they were St. Luke's or City personnel. While Walter was being moved, his voice-activated laptop computer fell and broke. At some point, Alixandra came back into the room and saw Susan on the floor bleeding.

Giblin said: "We are going to the hospital whether you like it or not." Susan then asked if Walter could be taken to Columbia Presbyterian, which has an ALS unit.[5]

5. Giblin denied that anyone told him Walter had previously been treated at Columbia Presbyterian.

Giblin responded, "No, we are going to St. Luke's Roosevelt." When Susan asked why, Giblin said "[b]ecause I said so."

City and St. Luke's personnel dismantled Alixandra's barricade, and dragged her out of the way. They then carried Walter out of the apartment. He had to be rolled in a stair chair down approximately seventeen steps and around three bends because there was no elevator between the Greens' eighteenth floor penthouse and the seventeenth floor. Alixandra realized that her father was uncomfortable, so she held his head with her hands. The officers and paramedics then transported Walter from the seventeenth floor to the lobby by elevator and from there to a waiting ambulance. Walter testified that the trip involved being "bumped downstairs, tilted uncomfortably in elevator, [and then] transferred again."

Walter arrived at St. Luke's, which is within ten minutes from the Green's apartment, at approximately 4:17 p.m. He was seen by Dr. Tiffany Reiser, who took a history from him by asking yes or no questions to which he responded by blinking. Dr. Reiser explained to Walter her reasons for believing he should stay in the hospital for awhile, and he consented. Susan also agreed, but wanted to transfer Walter to Columbia Presbyterian. At this point, the family knew that Susan would be unable to care for Walter for a period of time because she had incurred leg injuries as a result of the incident. Further, Alixandra was leaving for England the next day, and Walter's regular nurse, Shirley Barboza, was on vacation.

Asked to sum up his experiences of that day, Walter later said:

How to express in words the depth of pain I experienced that day. And it was by far the worst physical pain I've ever endured.... Nothing comes even close

to the pain of that day. I cried in my wife's arms for an hour.... For 40 years, I have protected my family up until March of last year. Even with this disease, I have worked diligently to provide for all aspects of their lives.... I watched my wife get knocked to the floor and told to be handcuffed. I saw my daughter manhandled by large men who claimed to be helping. My home was violated, my self-respect crushed, ... In the hospital, I couldn't look at my wife and children. I felt ashamed, and for the first time an utterly helpless man, worthless.

Susan also received medical attention at St Luke's for the injuries she incurred when she fell in the apartment.

*District court proceedings.*

On March 8, 2001, Walter, Susan, and Alixandra filed a complaint in the United States District Court for the Southern District of New York against New York City ["City"] and Giblin. On July 12, 2001, they filed an amended complaint adding St. Luke's as a defendant. In addition to alleging that defendants violated Walter's rights under the ADA and HRL by discriminating against him on the basis of disability, plaintiffs claimed that defendants violated certain of Walter's and Susan's constitutional rights and were thus liable pursuant to 42 U.S.C. § 1983. Further, they alleged that defendants committed various state law torts.

Although Walter died on December 9, 2001, the parties took his deposition prior to his death. At the completion of discovery, defendants moved for summary judgment. On referral, Magistrate Judge Gabriel W. Gorenstein recommended that the district court grant defendants' motion. *See Green v. City of New York*, No. 01 Civ.1996, slip op. at 36, 2004 WL 213009 (S.D.N.Y Feb. 4, 2004).

Addressing Walter's ADA claim, the magistrate judge first narrowed this claim's applicability to the City because Title II of the ADA applies only to public entities. *Green*, slip op. at 14. He further held that there was insufficient evidence in the record to support plaintiffs' claim that the officers decided to transport Walter to St. Luke's because of his inability to speak. *Id.* at 19. In so holding, the magistrate judge characterized, as Walter's "strongest piece of evidence," Bertin's testimony that Giblin admitted that if Walter could talk, he would not transport him to the hospital. *Id.* at 16. He rejected Giblin's statement as too ambiguous to be probative, stating:

> The statement could be understood in at least two ways: (1) to refer simply to Mr. Green communicating his desire not to go; and (2) to refer to Mr. Green in a state where he was actually able to draw breath on his own in a manner sufficient to "talk" and utter the words, "I do not want to go to the hospital."

*Id.* Even assuming that the statement had some probative value, Judge Gorenstein held that a reasonable jury could not find discrimination in face of the "overwhelming" evidence that Giblin was motivated by his conclusion that Walter was "in extremis." *Id.* at 16–19. He therefore recommended dismissing the ADA claim against all defendants.

Giblin moved for summary judgment on Walter's Section 1983 claims—which were read by the magistrate judge as alleging unlawful seizure and excessive force in violation of the Fourth Amendment and violation of Walter's Fourteenth Amendment right to refuse medical treatment—based on qualified immunity. The City contended that plaintiffs failed to state a claim for municipal liability, and St. Luke's contended that it did not act under color of state law. *Id.* at 19.

The magistrate judge first considered plaintiffs' Fourth Amendment claim against Giblin. As required by *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), he began by determining whether there was sufficient proof of a constitutional violation to allow a reasonable jury to conclude that one had occurred. *Green*, slip op. at 22. Based on uncontested facts, he found that the seizure was not unreasonable. Among other things, the magistrate judge noted that (1) the emergency crews had been called to the scene by Walter's daughter who told the 911 operator that Walter was dying; (2) Walter was not able to breathe on his own for the entire time that the emergency crew was there, and both of his ventilators were not working; (3) Walter had been unconscious for some period of time before the emergency crews arrived; (4) no licensed medical personnel were in the home; (5) manual pumping continued for the whole time the crews were there, approximately one and a half hours; and (6) Hill did not arrive while the EMS personnel were in the apartment. *Id.* Acknowledging that plaintiffs presented evidence that Walter communicated to officers that he did not want to go to the hospital, the magistrate judge nevertheless determined that the decision to transport him was reasonable because it balanced Walter's right to refuse treatment against the state's right to preserve life by "bringing [Walter] to a hospital where his condition could be properly treated and stabilized." *Id.* at 22–23. The magistrate judge also held that the defendants had a cognizable interest in protecting their employees from liability for abandoning Walter. *Id.* at 23. Because, in the magistrate judge's view, Walter's seizure was reasonable and he offered no evidence that the officers used any more force than was necessary to effect the seizure, the magistrate judge also

recommended dismissal of the excessive force claim. *Id.* at 24.

Based on a similar balancing analysis, the magistrate judge found no Fourteenth Amendment violation, concluding that "the crisis atmosphere would reasonably have caused the officers to conclude that this was not a setting in which Walter Green could make an informed and competent decision regarding his treatment." *Id.* at 23.

The magistrate judge then turned to the City's liability under Section 1983. He found that plaintiffs failed to offer evidence that the City had a policy of failing to evaluate a non-speaking person's refusal to accept medical assistance. In fact, the magistrate judge found that the on-scene evaluation by supervisors was simply a "different—and likely more appropriate—method of evaluation." *Id.* at 26. Magistrate Judge Gorenstein also rejected "failure to train" liability for the City. *Id.* at 27 (citing *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir.1992)).

Magistrate Judge Gorenstein next held that because plaintiffs named no individual St. Luke's employees as defendants, none of the actions of the St. Luke's employees at the scene were at issue. *Green*, slip op. at 28. He also held that plaintiffs had made out no claim based on the action of other individuals at St. Luke's because Walter consented to treatment and hospitalization once he arrived there. *Id.* Finally, the magistrate judge held that St. Lukes could not be liable for the acts of its employees under Section 1983. *Id.* at 29.

The magistrate judge then turned to Susan's Section 1983 claims for excessive force and false imprisonment. He recommended dismissal of her wrongful imprisonment claim because Susan offered no evidence that she was ever prevented from leaving her home. *Id.* at 29. Susan's excessive force claim was rejected because

there was no evidence that the only individual defendant, Giblin, used excessive force against her. *Id.* at 30.

In addressing Walter's state-law claims, the magistrate judge rejected the HRL claim for the same reason he had rejected the ADA claim—failure to offer proof of a discriminatory motive. *Id.* at 31. He recommended dismissal of the false imprisonment and arrest claims after holding that the officers were justified in their actions as a matter of law. *Id.* at 32. The magistrate judge also rejected Walter's assault and battery claims, finding that there was no evidence that the officers used more force than was necessary to remove Walter from his home and that the emergency medical technicians were immune from liability absent a showing of gross negligence. *Id.* at 33. He recommended dismissal of the negligence claim, which was premised on failure to train, for the same reason that he had recommended dismissal of the parallel Section 1983 claim. *Id.* at 35.

The magistrate judge also rejected Susan and Alixandra's assault and battery claims—Susan's because she acknowledged she was injured "when her own actions caused her to come in contact with Officer Henriquez's watch and fall," and Alixandra's because the officers used only the force necessary to get her out of the way and she incurred only a small bruise. *Id.* at 33–35.

Plaintiffs filed timely objections to the report-recommendation, which the district court rejected. *Green*, 2004 WL 213009, at * 2 (S.D.N.Y. Feb. 4, 2004). Judge Berman's decision and order was filed on February 4, 2004, and plaintiffs filed a timely notice of appeal on February 16, 2004. On appeal, plaintiffs contend that dismissal of each of their claims, with the

exception of those for false arrest and imprisonment, was erroneous.

## DISCUSSION

### I. The ADA Claim.

Walter alleged a violation of Title II of the ADA, which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Because defendants admit that Walter was a qualified individual, we need resolve only whether St. Luke's or Giblin is a public entity and whether there is sufficient proof that defendants discriminated against Walter in the provision of services, programs, or activities.

#### *Giblin*

As plaintiffs tacitly concede, Giblin, the principal actor in this case, is not a proper defendant because he is an individual, not a public entity. *See* 42 U.S.C. § 12131(1). Therefore, we affirm dismissal of the ADA claim against Giblin, and turn to the claim against the City.

#### *The City*

■ The service to which Walter was allegedly denied access is the city's system for evaluating refusals to accept medical assistance.[6] The city's evaluation system is not discriminatory with respect to non-verbal individuals, at least on paper. It has three components, the latter two of which should safeguard the rights of non-verbal individuals. First, on-scene personnel who are not sure of a patient's compe-

tence to refuse treatment may contact the telemetry service where a doctor can talk with the patient and evaluate her competence and the voluntariness of any refusal. *See* Guidelines, § 5.3.2(c)(3). Second, in the absence of a physician, a telemetry operator who cannot properly evaluate the patient's refusal is instructed to complete a questionnaire with the help of on-scene personnel who deal directly with the patient. *Id.* § 5.4.6(D). In theory, this approach could be used with a non-verbal patient who, like Walter, can communicate in an alternative manner. It would have been especially apt in this case since on-scene personnel had already informed the telemetry operator that Walter could communicate by computer or eye blinks.[7] However, no attempt was made by the telemetry operator to use it. The final component, which apparently was attempted in this case, is the use of an on-site supervisor. *Id.* § 5.5. The on-site supervisor is required to accept a refusal from a competent person who needs treatment after all attempts to persuade the person have been exhausted. *Id.* § 5.5.7. Because the Guidelines indicate that a patient may indicate his refusal and his understanding of the consequences either verbally or non-verbally, *id.* § 3.4.4, action by Giblin in compliance with this policy would have resulted in an evaluation of Walter's non-verbal refusals.

Thus, the problem, if one existed, was not the system; it was the failure of on-site and telemetry personnel to use the methods dictated by the Guidelines. There is ample circumstantial evidence in the record from which a jury could infer that the basis for denying Walter access to the system in place for evaluating a refusal

---

6. Plaintiffs frame this issue "alternatively" as being "permitted to refuse services."

7. In fact, the emergency room doctor who eventually secured Walter's consent to treatment did so by asking questions that Walter could answer by blinking.

to accept medical assistance was his disability. Jurors crediting the plaintiffs' witnesses could find that Susan and Bertin repeatedly called Giblin's attention to Walter's ability to communicate with eye blinks and his computer and that Giblin ignored this information. Further, although the telemetry operator was told that Walter could communicate by computer, the operator did not ask on-site personnel to complete the refusal-to-accept-medical-assistance questionnaire with him using these methods. The non-responses of both Lt. Giblin and the telemetry operator could enable a reasonable jury to conclude that they refused because Walter, as a result of his ALS, could not speak although he could communicate.[8] Further, Bertin testified that she told Giblin that Walter was alert and competent and that Giblin did not controvert her statement. Finally, the questionnaire appended to the Guidelines specifically asks whether the on-site supervisor spoke to the patient, suggesting that such communication is normally a part of the required procedure.

The record also contains direct evidence that Giblin did not evaluate Walter's refusal because Walter could not speak. Bertin testified that she asked Giblin if he would transport Walter if he could speak and that Giblin replied that he would not. The district court held that this statement was ambiguous as Giblin could have meant only that, if Walter could breathe and thus could talk, he would not have transported him. If this interpretation were accepted, the court reasoned, the decision to transport Walter was based on Walter's medical needs rather than on his disability.

The district court's ruling is problematic for three separate reasons. First, Walter's inability to breathe on his own was always present and, like his inability to talk, was caused by his primary disability. Walter could, within the parameters of his disability, have been healthy, and yet unable to breathe on his own or talk. Second, accepting plaintiffs' proof, Walter, despite his inability to breathe or talk, had the essential qualification for access to the city's evaluation system: He could communicate "verbally or non-verbally" that he understood the need for treatment and nevertheless refused it. Therefore, whether Giblin's decision was based on Walter's inability to speak or his inability to breathe, a reasonable fact-finder could find that he was denied the service because of his disability. Third, the district court, on summary judgment should have resolved the ambiguity against Giblin. *E.g., Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir.2000).

■ The City also argues that Bertin's description of Giblin's statement is hearsay. Of course, it is not. Bertin testified to a statement that she personally heard and, because Giblin is a party and spoke within the scope of his employment with another party, the City, the statement is admissible as a party admission against both Giblin and the City. *See* Fed.R.Evid. 801(d)(2)(A), (D).

Finally, the City argues, relying on *Anthony,* that Giblin's remark, even if admissible, is insufficient to sustain plaintiffs' burden of proof. In *Anthony,* we rejected a disability discrimination claim, where the

8. It is also possible that the telemetry service did not instruct Giblin to evaluate Walter's competence and refusal to accept treatment. Giblin testified that when he arrived on the scene, the crew told him that "they spoke to telemetry, that telemetry told them that since the patient could not speak to them, they could not relay the information back and forth, and they should transport the patient." If the finder of fact credited this testimony, it could find that Walter was denied services because of his disability based on telemetry's instructions.

proof of discriminatory intent in taking a person with Down Syndrome to a hospital and then hospitalizing her was limited to one officer's statement that "[plaintiff] 'seemed to be needing of assistance because she appeared to be slow.'" 339 F.3d at 141. *Anthony* is distinguishable in two respects. First, Giblin's statement, unlike that of the defendant in *Anthony*, was directly linked to the question of why he seized Walter without evaluating his alleged refusal to accept medical assistance. Second, as previously recounted, a great deal of circumstantial evidence supports a finding of discriminatory intent, and in particular an intent based on a stereotypical view of the abilities of a seriously physically handicapped individual. From all of this evidence, a reasonable jury could conclude that Giblin adopted a stereotyped view of Walter's abilities and therefore discriminated. *See* 42 U.S.C. § 12101(a)(7) (finding that "individuals with disabilities ... have been ... subjected to a history of purposeful unequal treatment ... resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society"). Unfortunately persons who are severely physically disabled are often perceived as incompetent. The evidence in this case could support a jury finding that Giblin perceived Walter as incompetent because of Walter's extreme physical disability and therefore denied him the right to use the City's evaluation system. Because a reasonable jury could find that Giblin declined to evaluate Walter's alleged non-verbal and computer-generated indicators of refusal to accept treatment on account of his disability, the district court erred by granting summary judgment dismissing Walter's ADA claim against the City.

*St. Luke's*

■ However, we affirm the district court's dismissal of the ADA claim against St. Luke's because it is not a public entity subject to suit under Title II. By statute, a "public entity" is defined as "(A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and (C) the National Railroad Passenger Corporation, and any commuter authority." 42 U.S.C. § 12131(1). Plaintiffs contend that St. Luke's is a public entity because in the actions under review in this lawsuit, it carried out a public function pursuant to a contract with the City, in accord with City rules, and under the direction of City employees. Plaintiffs fail, however, to grapple with the actual words of the statute.

"Statutory analysis begins with the text and its plain meaning, if it has one." *Gottlieb v. Carnival Corp.*, 436 F.3d 335, 337 (2d Cir.2006). Only if an attempt to discern the plain meaning fails because the statute is ambiguous, do we resort to canons of construction. *Id.* at 337. If both the plain language and the canons of construction fail to resolve the ambiguity, we turn to the legislative history. *Id.* at 338.

In parsing the statute, we note that it is clear that St. Luke's, a private hospital, is not (1) a state or local government, (2) a department, agency, or special purpose district of a state or local government, or (3) the National Railroad Passenger Corporation or a commuter authority. Therefore, we are left to determine whether "instrumentality," 42 U.S.C. § 12131(1)(B), was meant to include private hospitals that contract with a municipality to provide services.[9]

---

9. The regulation defining "public entity," 28 C.F.R. § 35.104, does not further define "in-strumentality," and therefore does not aid us in our task.

One relevant canon of construction is that in searching for the meaning Congress intended, we consider the context in which a particular word occurs because a statutory term "gathers meaning from the words around it." *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961). Although "[t]he maxim *noscitur a sociis,* that a word is known by the company it keeps, [is] not an inescapable rule, [it] is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." *Id.*

"Instrumentality," like "discovery," the word considered in *Jarecki,* is a word susceptible of more than one meaning and is therefore potentially ambiguous. It may, for instance, mean "something by which an end is achieved." Websters Third New International Dictionary 1172 (Philip Babcock Grove ed., 1993). But, it may also mean "a part, organ, or subsidiary branch, esp. of a governing body." *Id.* The former meaning supports the conclusion that a hospital that contracts with a municipality to provide services is an instrumentality, while the latter suggests that to be an instrumentality, an entity must somehow belong to the government or have been created by it.

Because of the "company ['instrumentality'] keeps," *Jarecki,* 367 U.S. at 307, 81 S.Ct. 1579, we hold that Congress intended the latter meaning. "Instrumentality," is one of a string of words that includes "agency," "department," and "special purpose district." All of the words in this string are qualified by "of a State or States or local government." Agencies and departments are units of a govern-mental entity while a special purpose district, at least in New York, is understood to mean a district set up by a municipality to serve certain needs such as sewer, drainage, parking, and the like. *See* N.Y. Town L. § 190; *Collins v. Town of Goshen,* 635 F.2d 954, 955–56 (2d Cir.1980). Each of the entities listed other than "instrumentalities" is thus a creature of the municipality or state whose ends it serves. We therefore conclude that "instrumentality" is likewise best read as referring to a creature of a state or municipality. A private hospital performing services pursuant to a contract with a municipality even if it does so according to the municipality's rules and under its direction, is not a creature of any governmental entity. Instead it is a parallel private entity. Because St. Luke's is a private, and not a public, entity, the district court correctly dismissed the ADA claim against St. Luke's.[10]

We note that the parties have not called our attention to—and our research has not revealed—any canon of construction or legislative history that would require a different result. We also note that, although precedent on this issue is sparse, the Eleventh Circuit has held that a hospice in receipt of federal funds was not a public entity. *See Schiavo ex rel Schindler v. Schiavo,* 403 F.3d 1289, 1293, App. at 1299 (11th Cir.2005) (per curiam).

## II.  Section 1983.

Plaintiffs' Section 1983 claims were somewhat loosely pleaded. Nevertheless, we accept the magistrate judge's conclusion that Walter alleged violations of his Fourth Amendment right to be free of

---

**10.** The same result would be achieved through application of *ejusdem generis,* "a rule of statutory construction that provides that when general words follow the enumeration of particular classes, the general words should be construed as applying only to things of the same general class as those enumerated." *Samuels, Kramer & Co. v. Comm'r of Internal Revenue,* 930 F.2d 975, 980 n. 2 (2d Cir.1991).

unreasonable seizures and excessive force and his Fourteenth Amendment right to refuse medical treatment because no party quarrels with that characterization. We also assume for the sake of this analysis that Susan made excessive-force and wrongful-detention claims. As with Walter's ADA claims, the Section 1983 claims are made against each of the three defendants: Giblin, the City, and St. Luke's. In addition to arguing that the plaintiffs failed to allege the deprivation of a cognizable constitutional right, each defendant makes arguments particular to that defendant's situation. We therefore again treat each defendant separately.

### The City

For the purpose of Section 1983, a municipality is not vicariously liable for the acts of its employees. *Coon v. Town of Springfield*, 404 F.3d 683, 686–87 (2d Cir. 2005) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Although there are several different ways of establishing municipal liability under Section 1983, the two relevant to this case are proving that (1) the municipality is aware that its policy for handling a given situation, although not unconstitutional in itself, may be applied unconstitutionally, but nevertheless consciously chooses not to train its employees in proper application of the policy; or (2) the municipality's practice, as opposed to its formal policy, is to engage in the constitutional violation at issue. *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125–26 (2d Cir.2004).

Plaintiffs contend that lack of knowledge of the City's official policy for evaluating refusals to accept medical treatment from non-verbal individuals was so widespread as to amount to an official unwritten policy not to evaluate such refusals. Alternatively, plaintiffs argue that the City is liable for its failure to train emergency personnel in the evaluation of treatment refusals by non-verbal persons.

A Section 1983 action may be maintained based on a practice that "was so 'persistent or widespread' as to constitute 'a custom or usage with the force of law.'" *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir.2004) (quoting *Sorlucco v. N.Y. City Police Dep't*, 971 F.2d 864, 870 (2d Cir.1992)). The alleged custom or practice need not be embodied in a rule or regulation. *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir.1996). However, the alleged practice "must be so manifest as to imply the constructive acquiescence of senior policy-making officials." *Sorlucco*, 971 F.2d at 871.

Failure to train subordinate municipal employees will trigger municipal liability "only where the failure to train amounts to deliberate indifference to the rights" of members of the public with whom the employees will interact. *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). In some cases, such as the use of deadly force, the risk to the public is so obvious and so great that failure to train on the applicable constitutional limitations constitutes deliberate indifference as a matter of law. *Id.* at 390 & n. 10, 109 S.Ct. 1197. In addition, where municipal employees "in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers," deliberate indifference will be found. *Id.* at 390 n. 10, 109 S.Ct. 1197.

We have described three requirements for showing that a lack of training manifests deliberate indifference. *See Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir.1992). First, to reach the jury, the plaintiff must offer evidence from which a reasonable jury could conclude "that a pol-

icy-maker knows 'to a moral certainty' that her employees will confront a given situation." *Id.* at 297 (quoting *City of Canton,* 489 U.S. at 390 n. 10, 109 S.Ct. 1197). Next, "the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation." *Walker,* 974 F.2d at 297. "Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.* at 298. In addition, at the summary judgment stage, plaintiffs must "identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Amnesty Am.,* 361 F.3d at 129 (internal quotation marks omitted).

As direct evidence in support of both its theories of municipal liability, plaintiffs rely on testimony that "[n]either defendant Giblin, nor any of the EMS staff knew the protocol for assessing a person's competence to refuse medical aid, had copies of the guidelines at hand or in memory, or could recall receiving training in these protocols." However, despite discovery, plaintiffs point to no other instance in which City personnel failed to properly evaluate a nonverbal individual's refusal to accept medical treatment.

To support the failure-to-train claim, plaintiffs also rely on a series of inferences. They first point to the congressional findings for the ADA, in which Congress estimated that over 43 million Americans suffer from some sort of disability. *See* 42 U.S.C. § 12101(a)(1). Next, they argue that a significant percentage of these disabled persons suffer from some sort of communications disability. From that as-

sumption, they posit that "[i]t is not unreasonable to conclude that multiple thousands of New Yorkers are affected with some sort of communications disability and that EMS staff will frequently confront situations in which they will be forced to assist persons suffering from some form of communications disability." Finally, they argue that had the officers been provided with simpler and clearer guidelines or offered training, they would more likely have made the constitutionally correct decision with respect to Walter's refusal to accept treatment.

Plaintiffs have not offered sufficient evidence of a widespread custom and practice to reach the jury. A reasonable jury could not find that evidence of one instance in which emergency personnel were not familiar with the correct protocol constituted a practice "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Sorlucco,* 971 F.2d at 871.

We also conclude that plaintiffs offered insufficient evidence to reach the jury on a failure-to-train theory; however, this issue is closer. Although plaintiffs offered no evidence of the number of people in New York who are disabled by their inability to communicate verbally, it is likely true, given the City's enormous population, that there are a substantial number of such people and that a significant subset of that population will, at some point in their lives, experience medical emergencies potentially calling for transportation to a medical facility. Further, emergency medical personnel who respond to a medical emergency involving a person who refuses to accept medical treatment do face a difficult choice between honoring the person's refusal and offering treatment or transportation for treatment that they feel is necessary. Because medical professionals are trained to heal, absent proper training,

they may well believe they should override the ill or injured person's refusal. Finally, proper training would increase the likelihood of a constitutionally appropriate response. *But see Walker,* 974 F.2d at 297 ("[A] policymaker does not exhibit deliberate indifference by failing to train employees for rare or unforeseen events.").

Two factors, however, cause us to conclude that a reasonable jury could not find for plaintiffs on a failure-to-train theory. First, despite the likelihood of a significant problem, there is no admissible evidence in the record of any problem. Second, and more important, the City did not fail to fulfill any training obligation it may have had. It provided personnel with guidelines that specifically and clearly informed them that they had to evaluate non-verbal refusals of medical treatment. Without evidence that these provisions were ignored prior to the incident at issue in this lawsuit, a reasonable jury could not find that the City had a further training obligation. Therefore, the district court correctly dismissed all Section 1983 claims against the City.

### St. Luke's

St. Luke's also is not vicariously liable for any constitutional torts that its employees may have committed. *See Rojas v. Alexander's Dep't Store, Inc.,* 924 F.2d 406, 408 (2d Cir.1990). As with the City, plaintiffs offer no evidence suggesting that St. Luke's had an unwritten policy that triggered the asserted violation of Walter's or Susan's constitutional rights. Further,

the Greens have offered no facts supporting a failure-to-train claim. To the extent that they implicitly rely on the inferences raised in support of the failure-to-train claim against the City, their effort fails a fortiori. Because any inference that can be drawn as to the number of communications-disabled persons who reside in the City is diminished by the percentage of those persons outside St. Luke's service area, the inference is far weaker than it would be in the case of the City.[11]

### Giblin

██ In addition to arguing that plaintiffs' Section 1983 claims against him should be rejected on the merits, Giblin contends that he would, in any case, be entitled to qualified immunity.[12] The defense of qualified immunity and the merits of the alleged constitutional violations are intertwined because the first step in a qualified immunity analysis is determining "in the light most favorable to the party asserting the injury, [if] the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. If the plaintiff has offered sufficient evidence that his constitutional rights were violated, the inquiry then turns to whether the right in question was clearly established at the time of the alleged violation. *Pena v. DePrisco,* 432 F.3d 98, 107 (2d Cir.2005). If the right was not clearly established, the defendant is not liable even if his actions did violate plaintiffs' constitutional rights. *See Saucier,* 533 U.S. at 206, 121 S.Ct. 2151.

---

11. Having determined that St. Luke's is not liable under Section 1983 because plaintiffs fail to offer evidence in support of any theory of employer liability, we need not reach St. Luke's alternative argument—that it did not act under color of state law.

12. Giblin contends that plaintiffs waived any argument that Giblin was not entitled to qualified immunity on their constitutional claims

by not raising the argument in their opening brief. There was no waiver. The district court determined that Giblin was entitled to qualified immunity because no constitutional violation occurred. *See Green,* slip. op. at 24. Plaintiffs fully explored the issue of whether a constitutional violation occurred in their opening brief.

■ We examine first Walter's claim that Giblin, by directing Walter's removal from his apartment and transport to the hospital, violated Walter's Fourth Amendment right to be free of an unreasonable seizure. In *Glass v. Mayas,* 984 F.2d 55 (2d Cir.1993), we analyzed the right of an individual to be free of a seizure necessary to secure his involuntary psychiatric hospitalization. *Id.* at 58. Although we ultimately held that the defendants were entitled to qualified immunity because a reasonable officer could have concluded plaintiff was dangerous, we first held that in order to constitutionally seize a person to transport him to a hospital, the person must be dangerous, presumably to himself or others. *Id.* For a competent adult, dangerousness to oneself justifying such a seizure does not include a refusal to accept medical treatment. *See Cruzan v. Dir., Mo. Dep't of Health,* 497 U.S. 261, 278, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990).

Giblin posits that Walter was in danger because he was not competent to refuse treatment and because he was "in extremis." The jury may find in Giblin's favor on this issue. However, there is substantial evidence to suggest that Walter was neither incompetent nor in extremis. Susan and Walter both testified that Walter communicated extensively about his wish not to go to the hospital. St. Luke's employee Collins told the telemetry operator that Walter could communicate by computer, and an EMS note indicates that Walter was communicating by blinks and computer. Further, Bertin testified that Walter was alert and actively communicating when she arrived, and both Bertin and Susan testified that they repeatedly requested that Giblin talk to Walter and ask him questions. It is uncontested that Giblin never attempted to assess Walter's competence.

Supporting the notion that Walter was not in extremis is Susan's testimony that his oxygen levels had returned to a level that was good for him as well as the fact that he was breathing. Although he was not breathing on his own, he never breathed on his own. The only difference in Walter's breathing at that time from his normal state of breathing was that he was being assisted by human beings rather than by a machine. There was no testimony or evidence that the ambu-bagging was not succeeding or that it was likely to fail before Hill arrived. If the Greens' version of events is accepted by the jury, Walter's right to remain free of an unreasonable seizure was violated.

We turn now to qualified immunity. Giblin is entitled to qualified immunity for the seizure he directed unless (1) Walter's constitutional right to be free from seizure was clearly established, and (2) it was objectively unreasonable for Giblin to believe that his conduct did not violate Walter's rights. *See Anthony,* 339 F.3d at 138 (2d Cir.2003). An officer's choices must be viewed as objectively reasonable unless "no officer of reasonable competence could have made the same choice in similar circumstances." *Lennon v. Miller,* 66 F.3d 416, 420–21 (2d Cir.1995). If there is a material question of fact as to the relevant surrounding circumstances, the question of objective reasonableness is for the jury. *Kerman v. City of New York,* 374 F.3d 93, 109 (2d Cir.2004). If there is no material question of fact, the court decides the qualified immunity issue as a matter of law. *Id.*

We hold that it was clearly established at the time of the incident under review that a competent adult could not be seized and transported for treatment unless she presented a danger to herself or others. *See Glass,* 984 F.2d at 57. Thus, to grant summary judgment, the district court was

required to (1) adopt the evidence in the record most favorable to plaintiffs, yet (2) hold that a reasonable officer could have perceived Walter as incompetent or a danger to himself or others.[13]

Giblin's justification for having ordered Walter's seizure was that (1) the paramedics at the scene told him Walter was not oriented; and (2) Walter appeared to be in extremis. Whether or not Walter was in extremis, the officers could not have seized him if he competently and voluntarily declined treatment. *See Cruzan,* 497 U.S. at 278, 110 S.Ct. 2841. Further, significant evidence suggests that Giblin's claim that he was informed Walter was not oriented was inaccurate. First, the EMS note stated that Walter was conscious and communicating. Second, St. Luke's paramedic Chris Collins testified that within twenty minutes of his arrival at the Greens' apartment, Walter had gone from a Glasgow Coma Score ("GCS") of three, which indicates unconsciousness, to a GCS of fifteen. The Glasgow Coma Scale tests whether a person is oriented to time, place, and person. Fifteen is the highest (most aware) score possible on the GCS.

Under these conditions, a reasonable jury could conclude that the paramedics at the scene knew that Walter was alert and oriented and were unlikely to have informed Giblin that Walter was not oriented. A reasonable jury could also conclude that the information known to the paramedics was reasonably available to Giblin and/or that Giblin could have asked Walter a series of simple questions to determine his competence. Therefore, the jury could conclude that, based on information readily available to Giblin, no reasonable officer would have concluded that Walter was incompetent to make decisions concerning

his treatment or a threat to himself or others. *See Kerman v. City of New York,* 261 F.3d 229, 241 (2d Cir.2001) (holding that an officer's failure to question knowledgeable and readily available persons concerning basis for plaintiff's seizure would enable a reasonable fact-finder to conclude "that the police acted outside the bounds of both the Fourth Amendment and the qualified immunity standards of objective reasonableness in placing [plaintiff] in restraints for his eventual transport"). We conclude that there are factual issues relevant to qualified immunity on Walter's Fourth Amendment seizure claim against Giblin and therefore reverse the district court's dismissal of this claim.

Having found issues of fact on the Fourth Amendment seizure claim, we have little difficulty concluding that we must also vacate dismissal of the Fourth Amendment excessive-force claim because that dismissal rested on the district court's conclusion that the force was no greater than required to seize Walter.

■■■ We turn next to Walter's Fourteenth Amendment claim. The district court dismissed this claim after holding that the chaotic and crisis-laden situation in the Green household would cause a reasonable officer to believe that Walter could not make a competent decision concerning his care and that he needed to be removed to a calmer atmosphere in order to make a decision. *See Green,* slip op. at 23. We affirm the district court's decision but disagree with its rationale.

Over fifteen years ago, the Supreme Court recognized "[t]he principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." *Cruzan,* 497

---

**13.** Dangerousness to one's self cannot be read to include a competent adult's right to refuse treatment because competent adults have a well-established right to refuse medical treatment. *Cruzan,* 497 U.S. at 278, 110 S.Ct. 2841.

U.S. at 278, 110 S.Ct. 2841. The *Cruzan* court added: "whether [an individual's] constitutional rights have been violated must be determined by balancing [this] liberty interest[ ] against the relevant state interests." *Id.* at 279, 110 S.Ct. 2841 (internal quotation marks omitted).

As we must, we address first whether Giblin violated Walter's constitutional right to refuse treatment by transporting him to the hospital. We frame the issue in this narrow fashion because there is no evidence in the record that Walter objected to the medical treatment given to him in the apartment or to the treatment he eventually received in the hospital. Rather, Walter objected only to being taken to the hospital. We do not believe that the mere act of transporting a person to the hospital constitutes treatment. Rather, this action is more properly considered as a seizure under the rubric of the Fourth Amendment. Therefore, we hold that the district court properly dismissed Walter's Fourteenth Amendment claim against Giblin.

We turn finally to Susan's Section 1983 claims. Susan waived her false imprisonment claim by failing to press it on appeal. *See Mitchell v. Fishbein,* 377 F.3d 157, 164 (2d Cir.2004). With respect to Lieutenant Giblin, the only remaining potential Section 1983 defendant, Susan's excessive-force claim also fails because there is no evidence that Giblin used any force against Susan.

## III. State law claims.

In addition to claiming discrimination in violation of the ADA, Walter claimed that defendants violated his right to be free of discrimination pursuant to the HRL. Section 296(2)(a) of the New York Executive Law provides:

It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodation ... because of the ... disability ... of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof.

Section 292(9) of the Executive Law defines "place of public accommodation" to include "hospitals" and "all public conveyances."

The district court dismissed Walter's HRL claim on the same basis that it dismissed the ADA claim, that is, that there was no basis for finding that either St. Luke's or the City discriminated. We vacate that determination with respect to the City because we have found sufficient evidence of discrimination.

We affirmed the district court's dismissal of Walter's ADA claims against St. Luke's and Giblin because they are not public entities within the meaning of Title II of the ADA. Because the HRL does not have a parallel requirement and applies to at least some individuals, *see Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313, 1317 (2d Cir.1995), *abrogated on other grounds, Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), we cannot affirm dismissal of the HRL claim on this ground. While other grounds for dismissal of the HRL claim against Giblin or St. Luke's may exist, they have not been argued. We therefore also reinstate the HRL claims against St. Luke's and Giblin. St. Luke's and Giblin remain free to raise alternative grounds in district court.

Plaintiffs' claims of negligence rest on St. Luke's and the City's alleged failure to train their employees. As noted previously, the plaintiffs have failed to provide any evidence from which a reasonable jury could find that St. Luke's or the City

had notice of a problem that required additional training. Therefore, the dismissal must be affirmed.

▉ St. Luke's argues that all of the plaintiffs' intentional-tort claims should be barred against it because plaintiffs did not add St. Luke's as a defendant until July 2001, more than a year after the March 2000 incident. New York Civil Practice Law and Rules § 215(3) provides a one-year statute of limitations for intentional torts. However, plaintiffs argue that their claims should relate back pursuant to Federal Rule of Civil Procedure 15(c) because "the claim ... asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading," *id.* § 15(c)(2). Plaintiffs' argument is not sound because St. Luke's lacked notice of the lawsuit against the City. *See Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 149 n. 3, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (per curiam) ("The rationale of Rule 15(c) is that a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide."). Because plaintiffs did not give notice of their intentional-tort claims to St. Luke's during the statutory period, the district court properly dismissed these claims.

▉ Remaining are plaintiffs' intentional-tort claims against the City. As noted previously, Susan has abandoned her false-imprisonment claim. We therefore turn to the Greens' assault and battery claims. A New York employer, such as the City, is liable for intentional torts, such as assault and battery, committed by its employees provided that the tort is committed within the scope of the plaintiff's employment. *See, e.g., Carnegie v. J.P. Phillips, Inc.*, 28 A.D.3d 599, 815 N.Y.S.2d 107, 108–09 (2d Dep't 2006). Because the

City does not argue that its officers acted outside the scope of their employment, we need only examine whether the conduct alleged by plaintiffs falls within the New York definition of assault and battery. New York defines "assault" as "an intentional placing of another person in fear of imminent harmful or offensive contact" and "civil battery [as] an intentional wrongful physical contact with another person without consent." *Charkhy v. Altman*, 252 A.D.2d 413, 678 N.Y.S.2d 40, 41 (1st Dep't 1998) (internal quotation marks omitted). Susan did not make allegations sufficient to claim either assault or battery because she did not testify that a city employee intentionally touched her without privilege or that an officer acted in a way that placed her "in fear of imminent harmful or offensive conduct." Therefore, the district court correctly dismissed Susan's assault and battery claims. However, both Alixandra and Walter claimed that officers did touch them without their permission and in an offensive manner. The district court was correct that Alixandra's injury was minor. However, seriousness of the injury does not appear to be an element of a New York assault claim, and we have found issues of fact as to the reasonableness of the seizure. Therefore, neither of the district court's bases for dismissing the assault and battery claims is sustainable.

## CONCLUSION

We affirm the judgment of the district court insofar as it (1) dismissed Walter's ADA claims against St. Luke's and Giblin; (2) dismissed all Section 1983 claims against the City and St. Luke's; (3) dismissed Susan's false-imprisonment and assault claims as well as her Section 1983 claims against Giblin and the City; (4) dismissed negligence claims against all defendants; (5) dismissed all intentional tort claims made against St. Luke's; and (5)

dismissed Walter's Fourteenth Amendment/Section 1983 claim against Giblin. As to all other claims, we vacate and remand for further proceedings not inconsistent with this opinion.